TYSON,. Presiding Judge.
The indictment charged the appellant with the first degree murder of Melvin Andrews Pruett “by shooting him with a .22 caliber rifle.” The jury found the appellant guilty of murder in the first degree and fixed punishment at imprisonment for life.
Prior to trial the appellant’s cause had been transferred to the Juvenile Court, and following a hearing and the determination of delinquency the case was then transferred to the Circuit Court for trial.
The appellant’s motion for a new trial, which challenged the weight and sufficiency of the evidence and the admission into evidence of the appellant’s confession, was denied following a hearing thereon.
James Taylor, Deputy Sheriff of Montgomery County, testified that on July 29, 1975, he received a call concerning a shooting somewhere in the southern part of Montgomery County. He stated that he, accompanied by Billy White, an Investigator, responded to the call and drove to the Crenshaw County line to the home of the appellant, Tommy Lee Myles, where they determined a shooting had taken place. He stated there were three or four people at the scene when they arrived. Deputy Taylor notified the Crenshaw County authorities and awaited their arrival. At this time State Investigators John Cloud and Neil Rucker were also at the scene. Soon thereafter, Crenshaw County Deputy Jeff Moseley and the coroner arrived. The body of a white male was in the back of a small yellow pickup truck. Deputy Taylor secured the scene until State Investigator John Cloud arrived and made photographs. Deputy Taylor indicated that his partner, Investigator Billy White, asked the appellant, a thirteen year old black boy, what happened. The appellant responded as follows (R. pp. 96-97):
“A. He said that the insurance man came to collect the insurance money, and after he came to the door, there were two other white men to arrive on the scene. He said that one of them shot him, and that they both ran. One ran behind the house down through the woods, and the other one ran out across the road.
“Q. Now, in this statement, did he say how the body got into the back of the pickup?
“A. He stated that he was trying to get the man to the doctor, and that he picked him up and put him in the truck, but he could not drive the truck away from there.
“Q. Approximately what time did you and investigator White leave?
“A. About three o’clock, I believe.
“Q. So, you were there roughly two to two and a half hours?
“A. Yes, sir.”
Sergeant John Cloud, employed by the Alabama Bureau of Investigation, Department of Public Safety, stated that he, accompanied by Corporal S. N. Rucker, drove to Crenshaw County, near Lapine, Alabama, on July 29, 1975. Upon arrival at a house, known as Route 1, Box 79, Lapine, there were a number of people present, including Montgomery County Deputy Sheriff Taylor and Investigator Billy White. The body of a white adult male was in the rear of a yellow Chevrolet pickup truck. “The man was dressed in a leisure suit, and the back portion of the suit had at least three holes that appeared to be bullet holes, through the outside of the jacket, and on later examination after pulling up the jacket, they did appear to be bullet holes in *844 the man’s back.” (R. p. 106) Sergeant Cloud stated the man was dead, and upon examination he discovered some discolored places in the sand between the house and the truck. He stated that the soil was sandy in nature and had the appearance of something having been dragged from the area.
Sergeant Cloud testified that later that afternoon, July 29, 1975, at approximately 3:20, the appellant, in the presence of Cren-shaw County Deputy Moseley, his mother, Mrs. Myles, and a young female, made a statement to Sergeant Cloud. He stated that prior to obtaining this statement there had been no threat, intimidation, coercion, or inducement made or offered to obtain the statement, nor at that time had the appellant been advised of his Miranda rights. However, at this point suspicion had not focused on the appellant. In the course of the conversation, the following developed (R. pp. 113-114):
“Q. And, yet on the basis of your conversation with Officer Taylor and with Officer White, you still did not consider the Defendant to be a suspect at that time?
“A. No, sir.
“Q. Had you developed any notions about what had happened at that time after you talked to Taylor and White?
“A. To my recollection, no, sir.
“Q. Did Officer Taylor or Officer White tell you of the conversation that they had with the Defendant, wherein, the Defendant allegedly told them that two white men had come up and shot the man, and that he had shot out through the window?
“A. No, sir.
“Q. They did not tell you that conversation?
“A. Part of that that you said was said, but not all of it.
“Q. Who told you about the conversation with the Defendant?
“A. I believe it was Deputy White.
“Q. What did he tell you?
“A. He told me that a young black male lived in that house had told him that the insurance man had come up there and he had paid a policy premium. And, that after the man left, two white men came up and eventually shot him on that side of the house, the parking area side of the house, and that one had run back into the woods, and that one run across the highway into the dirt road in the area.
“Q. Did Officer White or Taylor tell you they didn’t believe that story?
“A. More than likely, yes, sir.
“Q. They told you that, and didn’t they tell him that they did not believe that story?
“A. In those words, probably not, but yes, sir, that’s essentially what they said.
“Q. Essentially, it was conveyed to you that they did not believe that story?
“A. Yes, sir.”
The appellant’s mother, after talking with her son, Tommy Lee Myles, gave Deputy Moseley a pistol and a .22 rifle, which were subsequently delivered to the State Criminal Laboratory in Montgomery for examination.
Thereafter, Sergeant Cloud requested the permission of the appellant’s mother to take the appellant to the Crenshaw County Courthouse for the purpose of having him make a statement under oath. Mrs. Myles consented for her son to accompany the officers, but she did not go with them.
At approximately 4:50 on the afternoon of July 29, 1975, at the Crenshaw County Courthouse, in the presence of Corporal Rucker, Deputy Moseley, and Sergeant Cloud, the appellant gave a statement, after first being advised of his Miranda rights, and without any threat, coercion, promise, or other inducement, the appellant signed a waiver of rights form. Sergeant Cloud first determined that the appellant had gone through the sixth grade in school. He stated that no request was made for his mother to be present, and there was no request for an attorney, appellant having waived his right to counsel.
Mrs. Annie Gladys Myles took the stand for the purpose of explaining that she did not know the appellant did not have to *845 make a statement and did not know he had a right to talk with a lawyer, that, if she had known this, she would have contacted one for him; and she did not know that she could have gone downtown with her son when the officers took him to the Courthouse. She stated that her son’s date of birth was March 21, 1962, that he was now thirteen years of age, and had completed the sixth grade in school. She stated that commencing in July, 1974, her son had been conferring with some of the Mental Health authorities for Crenshaw County.
Sergeant John Cloud then took the stand and testified he found three holes in the kitchen window screen on the north side of the house, which faced the area where the body was found, and he also observed an area with red spots in the sand nearby. Cloud stated he asked the appellant’s mother and the appellant to accompany him to the Crenshaw County Courthouse for a sworn statement. Mrs. Myles consented for her son to go. He said he had not explained to her that her son had the right to talk with an attorney. Cloud stated that he heard no one threaten, intimidate, or offer any reward or hope of reward in order to obtain a statement from the appellant, including Deputy Moseley and Corporal Tucker. Sergeant Cloud stated the appellant’s Miranda rights were read to him after first ascertaining his age and educational background, and after full explanation, in the presence of the three officers, he executed a written waiver. Appellant then gave an oral statement which was later reduced to writing. After the statement was written and read back to the appellant, the appellant signed the statement. This was at approximately 5:20 p. m. on July 29, 1975, in the sheriff’s office at the County Courthouse. This statement is as follows (R. pp. 149-150):
“A. ‘The following is the oral statement of Tommy Lee Myles as given to Sergeant J. M. Cloud, Corporal S. N. Rucker, and Crenshaw County Deputy Jeff Moseley at the Crenshaw County Courthouse in Luverne, Alabama, on July 29, 1975 at 5:20 P.M.
“ ‘At a few minutes before twelve o’clock noon the policy man came to my house. He had called before he came so my mother gave me five dollars to give him before she left. When he came, the man from Independent Life, he knocked on the door and came in and sit down. “Did your mother leave some money for me” I said, “She left five dollars” He said, Hell, your mother is so far behind I can’t be running my gas over here for so little change. If you don’t come up with more money than this she’ll have to change policymen. Tell her to call me and see what she wants to do. I should never had a black person on my route anyway.” I told him, “get your body out of my house” He said, Damn Niggers, ought to go somewhere and kiss somebody’s ass. I said wait a minute and I sure will kiss yours. He walked away. I got the .22 rifle from under our couch and went into the kitchen window. I stuck the barrel through the screen and shot at him. I think I may have scraped his head because his hair flew up. He started running but it didn’t get him anywhere because I shot him again. I think I shot four or five times. He staggered back and fell down. I ran outside and looked at him, then I went back in and called my Aunt Alberta Perry. I told her somebody had come up there, two white men, and shot the Independent man. Then I drug the body up to his truck and put him in the back. I was going to get help for him. The truck was in reverse and it just went in a circle and I couldn’t drive it. Then my mother and my brother came up. I told them two white men did it too. I think I picked up one of the hulls in the kitchen and put it in my pocket but I don’t know where it is now. I don’t know where the others are.
“ ‘This is true and correct to the best of my knowledge and I was not forced to make it.
“ ‘Signed: Tommy Lee Myles. Witnessed: Jeff D. Moseley and S. N. RUCKER.’ ”
Sergeant Cloud then identified several photographs made at the Myles home, in- *846 eluding the kitchen window and screen, facing north. Sergeant Cloud further stated he was present at White Chapel Funeral Home in Montgomery when Dr. Richard Roper performed an autopsy on the body of the deceased, Melvin Andrews Pruett. Sergeant Cloud then identified photographs of the deceased made at White Chapel Funeral Home in the presence of Dr. Roper.
On cross-examination Sergeant Cloud admitted that Mrs. Myles did not go to the Crenshaw County Courthouse with them when they talked with her son, and that he did not discuss with her the appellant’s right to have a lawyer before he questioned him.
Sergeant Cloud on redirect examination stated he delivered the rifle which was received from Mrs. Myles to Dr. Richard A. Roper at the State Criminal Laboratory in Montgomery.
Dr. Richard A. Roper testified that he performed an autopsy on the body of the deceased, Melvin Andrews Pruett, on July 30, 1975, at the White Chapel Funeral Home in Montgomery, and that Sergeant John Cloud of the Alabama Bureau of Investigation was with him. He stated that Sergeant Cloud made some photographs during the post mortem examination. From Dr. Roper’s testimony (R. pp. 174-175):
“Q. Did you find any wounds on that body?
“A. Yes, sir.
“Q. Will you please tell the Jury what you found?
“A. In examining the body, I found a total of ten injuries. Several of these were abrasions. There was one on the chest, one on the left side of the forehead, and one on the right cheek. There were four bullet wounds of entrance in the right side of the back, and one was in the approximate middle of the back. If I may, I’ll indicate to the Jury on my own self?
“Q. All right?
“A. In the middle of the back here (indicating), another one slightly to the right of that (indicating), there was one in this portion of the back towards the side (indicating), and one up right and near the arm pit, in the back of the shoulder (indicating). Also, on the front of the body there were four — excuse me, there were three gunshot wounds of exit nature where bullets had exited, or left the body. One was in the right chest (indicating), one was in the approximate center of the chest over the breast bone (indicating), and the third one was towards the left side of the chest'near the shoulder (indicating).
“Q. Did you determine the cause of death in this case?
“A. Yes, sir, I did.
“Q. Will you please tell the Court what it was?
“A. Based on my examination of the body, I concluded that death resulted from hemorrhage or massive bleeding, and shock which is a condition which the body goes into from the bleeding. So, hemorrhage and shock, plus central nervous system trauma — in this particular instance, a bullet had penetrated the spinal cord, which is part of what we call the central nervous system, so in summary, death resulted from hemorrhage, shock, and central nervous system trauma, resulting from multiple gunshot wounds to the body.”
Dr. Roper further testified that he recovered a small caliber bullet within the spinal cord area, which was examined by Mr. Charles Smith, Criminalist, under his direction.
Charles Wesley Smith, former Criminalist with the State Crime Laboratory in Montgomery during July, 1975, testified he made an examination of a .22 caliber bullet received from Dr. Roper with some bullets which he test fired from a .22 caliber Remington, Model 55, semi-automatic rifle and found that the bullet received from Dr. Roper was definitely fired from the .22 rifle which he examined.
The appellant’s motions to exclude and for a directed verdict were overruled following argument.
*847 Dr. George Claire stated he was the Satellite Director of Mental Health for Butler County. He stated he first met the appellant, Tommy Lee Myles, on April 19, 1974 and talked with him monthly for varying periods until May 3, 1975. He stated that Myles had been referred to him by the Department of Pensions and Security because of an incident which occurred in school. He stated that the appellant had characteristics of irritability, brooding, discouragement, manifested by temper outburst, which were part of an adolescent condition. From the record (R. pp. 201-202):
“Q. Did you form a judgment on the basis of your observations of him, your conversations with him monthly, your diagnostic evaluation as to whether or not he knew right from wrong?
“A. Well, sir, there are two parts to the question that you are asking. The first part of this question is, if he was aware of the alternatives that were available to him.
“Second part, his ability to act on these alternatives, and of course we have to take into consideration the fact that he was in a sterile or isolated environment. He was in the counseling room, and in it, we are dealing with situations of behavior control problems, and we discuss the alternatives. He was aware of them and was able to assume them in this sterile counseling environment. But, his ability to act on these things outside of that sterile and isolated environment, I can’t testify to that.
“Q. Well, you don’t know whether he would have the ability to act on alternatives outside of a sterile environment?
“A. Without actually being there and talking to him about how he was feeling and responding, no.
“Q. When is the last time you saw Tommy?
“A. May 3, 1975.”
On cross-examination Dr. Claire stated that he could not give an opinion as to the appellant’s mental condition on July 29, 1975, since this was almost two and one-half months since he had last seen the appellant.
Appellant’s mother, Mrs. Annie Gladys Myles, testified that she was working as a domestic servant in Crenshaw County in July, 1975, having completed only the sixth grade in school. She testified that for almost a year her son had been going to the Mental Health authorities, that he was one of the youngest of her nine children. She stated her son was not stable. She recalled the afternoon of July 29, 1975, stating that she was not at home when the white man first came to their home, but her son Tommy was there. She stated that the two officers did talk with her and tell her they were going to take her son downtown for questioning, but she thought they were going to bring him home that night, that she did not see her son again until the next day. She stated she did not have any conversation with them concerning an attorney or that she could accompany them downtown.
The State called Kenneth P. Helms who testified that he talked with the appellant during the fourth, fifth, and sixth grades while he was' attending Highland Home School in Crenshaw County. He was the home room teacher of the appellant while in the sixth grade. Mr. Helms stated that the appellant was an “average student” and had made the following grades (R. pp. 219-221):
“Q. All right, referring to the school year 1975, what grades did he make the first semester, second semester, yearly average and citizenship?
“A. All right, just citing down, citizenship, he made C’s all the way across there. Reading, 80 in the first semester, 75 second semester, giving him a yearly average of 78.
“English, he had 62 in the first semester, 65 in the second semester, making a yearly average of 64.
“Spelling, first semester he had 83, second semester was 65, giving him a yearly average of 74.
“Writing, he had a B the first semester, C the second semester with a yearly average of a C.
“Social Studies, first semester was 67, 55 for the second, 59 for a yearly average.
*848 “P.E., he had an S all the way across, which is satisfactory.
“Arithmetic, first semester was 76, second semester 74, yearly average of 75.
“Science, he had 72 first semester, 58 second semester, making a yearly average of 65.
“Health, he had S’s all the way across, which again, means satisfactory. I believe that’s all.
“Q. All right, excuse me, I now refer you to section 4 here which is an evaluation of social and personal assets.
“Will you please describe to the Jury what you are grading him on in that respect?
“A. This is just in last years — .
“Q. Yes, explain to the Jury what cata-gories mean from 1 through 5?
“A. All right, one is superior; two is above average; three would be average; four is below average; and five would be low.
“In evaluation, we have cooperation, which is a three, and that’s average.
“Courtesy, that’s a three also.
“Dependability, that’s a three.
“Industriousness is also a three.
“Initiative, three.
“Leadership, three.
“Education maturity is a three.
“Personal appearance is a three.
“Self control, that’s a three also.
“All right, based on these evaluations that you’ve made of him, and the grades that you’ve read to the Jury and his evaluation, would you say he is an average student at Highland Home High School?
“A. Yes sir.”
Mr. Helms further stated that while he knew the appellant was going to the Cren-shaw area Mental Health on the monthly basis he did not have any conversations with Mr. Claire.
Crenshaw County Chief Deputy Sheriff Jeff Moseley stated he participated in the investigation of the slaying of Mr. Melvin Andrews Pruett on July 29, 1975. He stated he had gone to the Myles home and was present when the appellant gave his statement at the Crenshaw County Courthouse. He testified that there had been no threat, intimidation, coercion, or inducement made in exchange for.this statement. He stated the appellant was not tricked or abused in any way, and that his Miranda rights were read to him before he signed a written waiver. He stated that after the appellant’s statemerit was reduced to writing it was read back and gone over with the appellant, word for word, before the appellant signed it. He stated that after this the appellant asked him to call his mother, and he took him into the sheriff’s office, dialed her number, and the appellant talked with his mother at her residence.
Mr. Kenneth Helms was recalled to the stand and testified that, as the appellant’s teacher, he thought the appellant knew the difference between right and wrong and had the ability to adhere to the right.
Mr. Charles Richardson, Principal of Highland Home School, was called to the stand and testified that he had known the appellant for some six years as a student. He stated the appellant was “no different from other students, and in his judgment he was sane.”
The appellant then called John T. Montgomery who lived in Honoraville. He stated that he had known the appellant since September, 1975, when the appellant got out on bond for about eight months. From the record (R. p. 232):
“Q. Did you have an opportunity to observe him and talk to him during the time he was down there?
“A. Everyday.
“Q. Did you form any opinion as to whether or not he was of sound mind?
“A. Well, now, I wouldn’t say he’s not off, but I wouldn’t say that he’s what you would call crazy either.
“Q. And, what would you say he is?
“A. Well, he knows right from wrong.
“Q. Do you think that he had the ability to choose between right and wrong?
“A. Yeah, I do, yeah.
“Q. With whom have you discussed this case, Mr. Montgomery?
*849 “A. I didn’t understand you?
“Q. With whom have you discussed this case?
“A. No one.
“Q. You haven’t discussed it with anybody?
“A. No.
“Q. You haven’t discussed it with anybody today?
“A. No.
“Q. Not even with me?
“A. Well, I spoke to you about it when you come in this morning.”
The appellant’s attorney claimed surprise and was allowed to cross-examine Mr. Montgomery further (R. pp. 233-234):
“Q. And, did you tell me whether or not you had talked to any of the State people about appearing as a witness?
“A. No, I didn’t mention nothing about it.
“Q. You didn’t mention anything about it?
“A. No.
“Q. Did you mention to me why you had been called as a witness?
“A. No, I told you that I didn’t know why. I didn’t know no more about Tommy, other than while I was in jail with him.
“Q. What else did you tell me?
“A. That I was going to tell you that I couldn’t swear that he was crazy, but he wasn’t exactly at his self.
“Q. That he wasn’t exactly at himself?
“A. Yes, sir.
“Q. This is what you told me?
“A. Yes, sir.
“Q. What did I tell you?
“BY MR. KING: We object to that.
“BY THE COURT: Sustained. I think Mr. Seay knows better than that.
“BY MR. SEAY: I don’t have any further questions.
“BY MR. KING: We don’t have any cross examination of this witness, Your Honor.
“BY THE COURT: All right, you may step down.”
I
The principal issue presented by this appeal concerns the admission into evidence of the statement of Tommy Lee "Myles given to the officers, Cloud, Rucker, and Moseley, at the Crenshaw County Courthouse on the late afternoon of July 29, 1975. This Court has endeavored to painstakingly set forth evidence because of age, background, and suggestions as to appellant’s mental competency made at trial and during argument before this Court.
The appellant’s counsel also asserts that since he was a juvenile the appellant did not have the capacity to waive his rights under the Fifth and Sixth Amendments of the Constitution of the United States.
The legal issue before this Court in this appeal was most recently resolved in an opinion by Judge Bowen, speaking for the Court in Parker v. State, Ala.Cr.App., 351 So.2d 927 (1977) cert. quashed as improvidently granted, Ala. (1977) 351 So.2d 938. In this opinion Judge Bowen points out that the confession of a minor is not ipso facto inadmissible. From Parker v. State, supra:
“ . . .A number of courts have considered the question of the competency of a minor, without the guidance of a parent, attorney, or other friendly adult, to make an intelligent, understanding, and voluntary waiver of his constitutional rights.
“ ‘Most courts that have considered this question have concluded that there is no absolute requirement that a parent or attorney be present in order for a child to make an effective waiver, or, put another way, that a child is not presumed, for reasons of age alone, to be incapable of waiving his rights by himself. Rather, the effectiveness of the waiver is determined by examining the totality-of-the circumstances surrounding the giving of the statements, and some courts in using this approach have employed what amounts to a voluntariness test rather than a literal application of Miranda.’ S. Davis, Rights of Juveniles: The Juvenile Justice System, 1974, p. 92.
*850 “Most of the decisions that examine the totality of the circumstances to determine the voluntariness of a minor’s confession and waiver rely on Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) and Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). The leading case so holding is People v. Lara, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967), cert. denied, 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407 (1968) wherein the California Supreme Court stated that:
“ ‘We cannot accept the suggestion of certain commentators . . . that ev.ery minor is incompetent as a matter of law to waive his constitutional rights to remain silent and to an attorney unless the waiver is consented to by an attorney or by a parent or guardian who has himself been advised of the minor’s rights.’ “The court concluded that a minor has the capacity to make a voluntary confession even in a capital case, without the presence or consent of counsel or other responsible adult. The court said that the admissibility of such a confession depends not on age alone but with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statements.
“In West v. United States, 399 F.2d 467 (5th Cir. 1968), the court set forth the circumstances to be considered in determining the validity of a minor’s waiver of Miranda rights:
“ ‘(1) age of the accused; (2) education of the accused; (3) knowledge of the accused as to both the substance of the charge, if any has been filed, and the nature of his rights to consult with an attorney and remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) methods used in interrogation; (7) length of interrogations; (8) whether vel non the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused had repudiated an extra judicial statement at a later date.’ 399 F.2d at 469.
“It should be noted that in some of the cases employing a totality of the circumstances approach, the importance of a parent’s presence in determining the effectiveness of a waiver of constitutional rights had been urged in the very strongest terms but not required.
“A number of states now require the presence of a parent before an effective waiver can be found. See, e. g., Colo.Rev. Stat.Ann. § 19-2-102(3)(c)(I) (1974) (requires that warnings be given to both child and parent or legal custodian and requires presence of parent or legal custodian during any questioning); Conn. Gen.Stat.Ann. § 17-66d (1975) (identical to Colorado provision); Okllo.Stat.Ann. Title 10, § 1109(a) (Supp.1973) (requires that warnings be given to both child and parent or legal custodian); N.M.Stat. Ann. § 13-14-25(A) (Supp.1973) (child cannot be questioned except in presence of parent or counsel). See also Freeman v. Wilcox, 119 Ga.App. 325, 167 S.E.2d 163 (1969); Lewis v. State, 259 Ind. 431, 288 N.E.2d 138 (1972). Alabama has no such requirement and, under the totality of the circumstances test, the absence of a parent is just one factor or circumstance to consider in determining volun-tariness.
“Using those criteria pronounced in West v. United States, supra, we now proceed to examine the totality of the circumstances under which the confession of the appellant was made.”
1. The appellant was thirteen years old when he made the confession.
2. The appellant had completed the sixth grade in school and was, in the words of his teacher, an average student who knew the difference between right and wrong. Testimony concerning his academic grades is set forth in this opinion.
3. Sergeant Cloud, together with Deputy Moseley and Investigator Rucker, advised Mrs. Myles that they wanted to dis *851 cuss the shooting with the appellant. No charges had been preferred at the time the conversation was made. The appellant had not been threatened, intimidated, tricked, coerced, or induced in any way to give a statement.
Myles’ rights were first read to him, and he signed a written waiver at the Crenshaw County Courthouse after talking with the three officers for less than twenty minutes. The appellant did not testify on the issue of the voluntariness of his statement nor in his defense at trial. Each officer denied that he had previously talked with the appellant at his home and had explained to his mother the reason for taking him was to get a sworn statement from him. They received her permission to take him to the Crenshaw County Courthouse.
4. There is no evidence whatsoever that the appellant was held incommunicado or that he was mistreated by the three officers in any way.
5. The appellant was interrogated before any formal charges were filed.
6. From a careful examination of the record, it does not appear that any of the officers employed any third degree tactics or exerted any physical or psychological coercion. The appellant was not told that it would be better for him to make a statement or worse for him to make a statement.
7. The total time span for the interrogation at the Crenshaw County Courthouse was less than forty-five minutes, including advice concerning his legal rights.
8. It does not appear that the appellant refused to give a voluntary statement, or requested the presence of his mother, or any other relative or friend. In fact, according to Deputy Moseley, he was allowed to talk with his mother by telephone shortly after giving the officers his statement.
9. The appellant never repudiated his statement given to the three officers at the Crenshaw County Courthouse, and no testimony was presented at trial to contradict this statement.
As noted by Judge Bowen in Parker v. State, supra:
“ . . . Had we found any indication that the appellant sought to exercise his privilege against self-incrimination or requested the assistance of counsel or parents, we would have reversed his present conviction without hesitation. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).”
We have carefully examined this record and find no error therein.[1]
This Court is of the opinion that the judgment of conviction is due to be and the same is hereby
AFFIRMED.
All the Judges concur.

. Article 5 of Act 1205, Acts of Alabama 1975, approved October 10, 1975, is not applicable to the confession of a minor made before January 16, 1977, by virtue of the resolution of the Supreme Court of Alabama, dated December 1, 1975; see Parker v. State, 8 Div. 905, Ala.Cr.App., 351 So.2d 927, supra.