The defendant, Daniel Ray Ash, stands charged with the murder of six-year-old Wendy Michelle Mancil. The defendant was seventeen years old at the time of the crime. Pursuant to Alabama Code Section 12-15-34 (1975), the district attorney filed a motion in the juvenile (district) court to transfer the defendant from juvenile court to circuit court for prosecution as an adult. After a hearing, the juvenile court granted the State's motion and transferred the defendant to the circuit court of Tallapoosa County. The defendant appealed from that order and a trial de novo was had in the circuit court. Rule 28, A.R.J.P. The circuit court rendered judgment granting the State's motion and ordering the case transferred to the circuit court for criminal prosecution.
The defendant contends that his confession was improperly induced and a search of his residence was unconstitutional. He argues that, therefore, evidence of the confession and search was improperly admitted at the hearing on the motion to transfer in order to establish probable cause to believe that he committed the homicide. He argues that without the admission of this illegal and unconstitutional evidence the State failed to establish probable cause.
"The trial court can grant a motion to transfer only after considering the six factors listed in Section 12-15-34 (d) and finding that probable cause exists to believe that the allegations are true." Gulledge v. State, 419 So.2d 219 (Ala. 1982); Duncan v. State, 394 So.2d 930, 932 (Ala. 1981). The circuit court complied with Section 12-15-34 (f) and considered the six factors there listed in ordering Ash transferred.[1]
There is no argument to the contrary. The only issue is whether the confession and search were properly considered in establishing probable cause.
A hearing on a motion to transfer involves a probable cause hearing. Duncan, *Page 1383 
394 So.2d at 932. "Such a hearing is not designed to determine the guilt or innocence of the child accused of the crime, but is instead a hearing to determine whether the child should be transferred out of the juvenile court for criminal prosecution as an adult." Duncan, 394 So.2d at 932. For this reason, the strict standard of proof beyond a reasonable doubt does not apply. Brown v. State, 353 So.2d 1384 (Ala. 1978). "The only standard which must be met is whether a reasonable man would believe the crime occurred and that the defendant committed it." Duncan, 394 So.2d at 932.
Since strict rules of evidence do not apply in probable cause hearings and because a transfer hearing does not determine the guilt or innocence of the juvenile, latitude is permitted in admitting evidence in a transfer hearing which would be otherwise inadmissible in a criminal prosecution. Winstead v.State, 371 So.2d 418 (Ala. 1979) (A voluntary confession of a defendant is admissible in a transfer proceeding even though no attorney was present at the time the confession was made);Vincent v. State, 349 So.2d 1145 (Ala. 1977) (The uncorroborated testimony of accomplice is a sufficient basis for a finding of probable cause); Armstrong v. State, 294 Ala. 100, 312 So.2d 620 (1970) (The uncorroborated testimony of an accomplice is admissible); Gulledge (Hearsay evidence may properly be considered).
With regard to confessions, statements, searches and seizures involving juveniles, Section 12-15-66 (b) provides:
 "An extrajudicial statement which would be constitutionally inadmissible in a criminal proceeding shall not be received in evidence over objection. Evidence illegally seized or obtained shall not be received in evidence over objection to establish the allegations against him. An extrajudicial admission or confession made by the child out of court is insufficient to support a finding that the child committed the acts alleged in the petition unless corroborated by other evidence."
Consequently, before evidence of the defendant's confession and the search of his residence could properly be introduced into evidence, over the objection of defense counsel, this evidence must have been constitutionally obtained.
On Saturday morning, May 29, 1982, Wendy Mancil was reported missing. Her body was found three days later on the morning of June 1, 1982. A postmortem examination classified her death as homicide and listed the cause of death as "ligature strangulation". The child's body was found on the property of Rev. and Mrs. Ash, the defendant's parents, and within one mile of her residence.
Mike Sullivan, an investigator with the Alabama Bureau of Investigation, Department of Public Safety, became involved in the investigation of the missing child on Sunday, May 30. At the request of members of the Tallapoosa County Sheriff's Office he began interviewing "the neighbors that lived in that area." Sometime after 2:00 o'clock Sunday afternoon he talked with the defendant for "30 or 45 minutes" at the Carrville Police Department.
After Wendy's body had been found, law enforcement officials (Chief Dan Stalnaker of the Carrville Police Department, Deputy District Attorney Mitchell Gavin and Investigator Wayne Chase with the District Attorney's Office) came to the home of Edgar Lambert, the defendant's father-in-law around 1:00 or 1:30 o'clock on the Tuesday afternoon of June 1st. Investigator Chase told Rev. Martin Ash, the defendant's father, that they wanted to talk to the defendant because he had been the last person to see Wendy alive. Earlier that day, before the police arrived, the defendant and his parents had learned that Wendy's body had been found on the Ash property. One of the law enforcement officials told Rev. Ash that they wanted him to come with them. The defendant and his father were then taken to the Sheriff's Office in the County courthouse.
Rev. Ash testified that Investigator Sullivan advised the defendant of his Miranda *Page 1384 
rights and afterward the juvenile probation officer "point(ed) out some things." Sullivan stated that he did not give such advice. However, Eddie Lancaster, the Juvenile Probation Officer for Tallapoosa County, testified that he advised both Rev. Ash and the defendant of their rights around 3:00 o'clock P.M. when they signed a notification of rights form.
Rev. Ash testified that when he signed the waiver of rights form, he told Sullivan and Lancaster that, if the defendant was being accused of anything, he wanted an attorney. Sullivan stated that, although he did not remember Rev. Ash's exact words, he told Ash that the defendant was not being accused by him at that time. Sullivan also testified that Ash "asked and inquired about a lawyer and he was told that would be left up to him if he wanted a lawyer or not, but his son was not being accused at that time."
Lancaster also remembered Ash saying something about a lawyer and stated that in response to that inquiry, Ash was told that, if he would like a lawyer, "one can be provided right now."
Rev. Ash also testified that when he stated that he wanted a lawyer if the defendant was being accused of anything he was told "we have a Juvenile Officer right here, and the Juvenile Officer will protect all of Danny's rights. That that's what he is here for, he is going to protect Danny's rights." Lancaster testified that no one ever stated that an attorney was not necessary.
The waiver form was signed at 3:00 o'clock P.M. by both the defendant and Rev. Ash. The questioning of the defendant by Investigator Sullivan then started and lasted approximately one hour. Lancaster was present, with the defendant, during the entire period of this questioning.
After a break in the questioning, Investigator Jimmy Abbett of the Alabama Bureau of Investigation began questioning the defendant at 5:27 P.M. Between these two interviews the defendant was with his wife and the juvenile officer. There was no law enforcement officer in the room at that time. Lancaster testified that, when the defendant asked to see his wife, he went and got her. Lancaster also stated that the defendant never asked to see his father or an attorney. After the first interview by Sullivan, the defendant asked Lancaster "not to let Mike Sullivan back in and talk to him anymore" but did not state the reason for this request. The defendant initially admitted the killing to Lancaster.
Investigator Abbett advised the defendant of his constitutional rights. The defendant signed a second waiver of counsel form at 5:30 P.M. He then gave a written statement which he signed at 6:55 P.M. Lancaster was also present during this interrogation.
In his confession, the defendant stated that he played "cowboys and Indians" with Wendy and that he remembered tying her hands and feet with nylon cord. The next thing he remembered was "seeing a cord around her neck" and checking the child to discover that she was dead.
Sometime before 6:55 P.M., Assistant District Attorney Gavin told the defendant's parents that the defendant had confessed. Rev. Ash did not request an attorney at that time.
Both Rev. and Mrs. Ash testified that after 4:30 P.M. Rev. Ash repeatedly asked but was not allowed to see his son. They stated that Assistant District Attorney Ray Martin kept telling them to "wait a few minutes . . . just a few minutes more." This was in direct conflict with Martin's testimony that "on several occasions" Rev. Ash asked "how much longer any questioning was going to go on" but on only one occasion did Rev. Ash request to see his son: "I do remember him one time asking me, or telling me, or asking me if he could see Danny, and at that time, we did go downstairs."
Lancaster testified that "(a)t the times that I spoke with (the defendant), and the *Page 1385 
conversations I carried on, I considered him an adult in conversations." He stated that in his judgment the defendant's emotional maturity was "stable" and "above average" and that the defendant was "very bright" and "carried on conversations . . . way above the level of a juvenile his age." He saw nothing to indicate or suggest that the defendant "was in any way incapacitated or had any problems, physical, mental or emotional."
When the crime was committed, the defendant was within two months of his eighteenth birthday. He was married in November of 1981, and his wife was nineteen years old. He did not graduate from high school because he lacked one-half credit in English.
Within one month after the crime was committed, the defendant was given a social, psychological and educational evaluation at the Diagnostic and Evaluation Center of the Alabama Department of Youth Services. Those studies revealed that the defendant was "currently functioning in the high-average range of intelligence"; that while not psychotic, he did appear to have "emotional problems of a longstanding nature * * * * which appear related to his strong aggressive and sexual impulses which conflict with parental expectations and his own moral standards." The defendant reported having no memory of murdering the child. The report found that while this "amnesia appears to be psychogenic in nature, organic factors cannot be conclusively ruled out at this time."
The Alabama Rules of Juvenile Procedure "govern the procedure for all matters in the juvenile court." Rule 1, ARJP. Rule 21, ARJP, provides that "(a)n extrajudicial statement made by a child may be admissible if given by the child in accordance with the requirements of the Constitution and the prevailing case law as expressed by the appellate courts." See also Section 12-15-66. Since Rule 21 became effective on March 1, 1982, it applies to the defendant's confession of June 1, 1982.
Alabama Code 1975, Section 12-15-67, requiring that "(u)nless advised by counsel, the statements of a child . . . made while in custody . . . shall not be used . . . in a criminal proceeding prior to conviction", was specifically repealed by Acts 1981, No. 81-344, p. 500, effective April 29, 1981, and has no application.
A great deal of the evidence concerning the voluntariness of the confession is conflicting. Consequently, the finding of voluntariness must be upheld unless palpably contrary to the weight of the evidence. Woodson v. State, 405 So.2d 967
(Ala.Cr.App.), cert. denied, Ex parte Woodson, 405 So.2d 969
(Ala. 1981); Thompson v. State, 347 So.2d 1371 (Ala.Cr.App.), cert. denied, Ex parte Thompson, 347 So.2d 1377 (Ala. 1977), cert. denied, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765
(1978).
 "(I)t is not unusual for the voluntariness inquiry to present conflicting evidence. . . . When such a conflict occurs and the trial judge finds that the confession was voluntarily made, great weight must be given to his judgment. This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the weight of the evidence. . . . Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty." McNair v. State, 50 Ala. App. 465, 470, 280 So.2d 171 (1973) (citations omitted).
The most serious question in regard to the voluntariness issue concerns the father's request for an attorney for the defendant if the defendant was being charged. The contention that the defendant's father was refused admission to see his son is contradicted by other evidence. The defendant was within two months of legally being an adult. Section 12-15-1 (3). *Page 1386 
He was of above average intelligence. There is no evidence of coercion or lengthy interrogation. He was twice advised of his constitutional rights and signed two written waivers. There is no evidence that the defendant was forbidden to contact his family and there is evidence that he was allowed to see his wife, the only person he requested to see. There is no evidence of coercion or threatening. Although there was testimony that the defendant asked that Sullivan not question him a second time, there was no evidence of intimidation. There was conflicting evidence on whether or not the defendant was held incommunicado but no evidence the defendant was denied any request he made to see anyone. Before and when the defendant signed a written waiver he was with his father, who also signed a waiver after both men had been advised of their rights. SeeBreshers v. State, 572 P.2d 561 (Okla.Cr. 1977). Compare Mylesv. State, 354 So.2d 842 (Ala.Cr.App. 1977).
In Alabama, there is no requirement that the juvenile's parents be notified before or be present when the juvenile waives his constitutional rights. Likewise, there is no statute mandating the presence of a parent, guardian, legal custodian or attorney of a child during interrogation.
There is no evidence that the defendant was subjected to the hostile and threatening and coercive type of interrogation found in Garrett v. State, 369 So.2d 833 (Ala. 1979).
There is no evidence that the confession or waiver of rights was obtained by any type of improper inducement. The police took the defendant into custody for questioning because he was the last person to have seen the missing child alive. There is no evidence that the defendant was being charged at that time or that the authorities intended, before the questioning ever started, to bring charges at a time in the future. Although the defendant must have been considered a suspect because he was the last person to have seen the child, the defendant and his father were informed of this fact. There is no evidence that the police had sufficient information to constitute probable cause to arrest the defendant for murder prior to his confession. Additionally, the assurances that the defendant was not being charged with anything do not appear to have been false statements or deceptions employed by the officers in order to secure a waiver and confession. People v. De Flumer,21 A.D.2d 959, 251 N.Y.S.2d 814, affirmed, 16 N.Y.2d 20,261 N.Y.S.2d 42, 209 N.E.2d 93 (1965). Compare Re L.,29 A.D.2d 182, 287 N.Y.S.2d 218 (1968) (confession of 14-year-old inadmissible in homicide case where, among other factors, his mother was not advised of her son's right to counsel and was told that she need not accompany him to the station because the questioning was "not a serious matter");Myles, supra.
Upon the question of the admissibility of a confession, each case must rest upon its own peculiar details and circumstances.Johnson v. State, 242 Ala. 278, 5 So.2d 632, cert. denied,316 U.S. 693, 62 S.Ct. 1299, 86 L.Ed. 1763 (1942). Generally, on the admissibility of a minor's confession, see Anno. 87 A.L.R.2d 624 (1963). An important factor to note in determining the voluntariness of the confession is the fact that the defendant first admitted the murder to Lancaster. See Little v.State, 261 Ark. 859, 554 S.W.2d 312 (1977).
We have examined the totality of the circumstances surrounding the defendant's confession. We find that the confession was voluntarily given after a knowing and intelligent waiver which passes constitutional muster.
 II
For approximately six weeks prior to the homicide, the defendant and his wife had been living in a "fallout shelter" behind the residence of Edgar Lambert, the defendant's father-in-law. Based on the information contained in the defendant's statement, Investigator Abbett obtained a search *Page 1387 
warrant for the defendant's residence. The search began around midnight on June 1st.
Abbett also obtained consent to search the residence. The defendant signed a consent to search at 10:37 on the night of June 1st. Mr. and Mrs. Lambert and their daughter, the defendant's wife, signed a consent form at 11:57 that night. Although it is argued that the parties were asleep immediately before signing and this prevented a voluntary consent, there is no evidence to support this allegation.
Our review convinces us that the State established a prima facie case that the Fourth Amendment protection from warrantless searches and seizures was waived by a voluntary consent. United States v. Watson, 423 U.S. 411, 96 S.Ct. 820,46 L.Ed.2d 598 (1976); Schneckloth v. Bustamonte, 412 U.S. 218,93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
Although there was testimony that the fallout shelter was searched before the child's body was found, it appears that at least one of these searches was in the defendant's presence and at his invitation. Moreover, any search of the defendant's residence before the body was found and before the confession appears to have been solely in an attempt to locate the missing child. There is no evidence that the purpose of any such search was to seek information which could be used to incriminate anyone. A warrantless search of premises may be undertaken upon reasonable cause to believe that those premises contain individuals in imminent danger of death or serious bodily harm. W. LaFave, Search and Seizure, Section 6.5 (d) (1978).
 III
The defendant's confession was self-verifying and corroborated by the physical details of the crime itself and the location of the child's body. The circumstances of the homicide are such that only the perpetrator would have had knowledge of the details of the crime. Probable cause to believe that the defendant committed the acts alleged in the transfer petition is not supplied by the defendant's uncorroborated confession.
After a review of the record, we find no error in the order of the circuit court transferring the defendant for criminal prosecution. The judgment of the circuit court is affirmed.
AFFIRMED.
All the Judges concur.
[1] The order of the circuit court granting the State's motion to transfer the defendant to the circuit court for prosecution as an adult is as follows:
"The State heretofore petitioned the Juvenile Court to transfer the above Defendant to the Circuit Court for prosecution therein, and the Juvenile Court granted said petition and entered an order to that effect. From said order, Defendant appealed to this Court for trial de novo on the State's petition.
"All parties in open Court agreed that the transcript of the proceedings in the Juvenile Court would be admitted into evidence and that this Court could consider all testimony and other evidence contained in said transcript as if the same had been presented before this Court. In addition, it was agreed that each party could present such other or further evidence before this Court as they saw fit.
"After considering all the evidence before the Court (both the transcript from the Juvenile Court proceedings and testimony ore tenus before this Court), this Court makes the following findings:
 "1. That the present alleged offense is a brutal, heinous homicide;
 "2. That the Defendant physically is mature, and that he is mentally and emotionally above average for his age;
 "3. That it is in the best interest of the community that the State's petition be granted and that Defendant be placed under legal restraint and discipline;
 "4. That there are no reasonable grounds to believe that Defendant is mentally ill or retarded, or that he should be committed to an institution or agency for the mentally retarded;
 "5. That there is probable cause for believing that the Defendant committed the alleged offense, and that the allegations in the State's petition are otherwise true and correct;
 "6. That it is in the best interest of the public that the State's petition be granted;
 "7. That Defendant has no juvenile record or criminal record and therefore there have been no previous treatment efforts;
 "8. That Defendant's demeanor is calm, but alert, and otherwise normal.
"The foregoing considered, it is the ORDER and JUDGMENT of this Court that the State's petition or motion to transfer Defendant and this case to Circuit Court for prosecution of Defendant as an adult, is hereby granted.
"Let a copy of this Order be mailed by the Clerk to Defendant's attorney of record and to the District Attorney.
"This 13th day of September, 1982."