[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 885 
The appellant, Gerald Homer Ingram, Jr., was convicted of murder made capital for an intentional killing during the course of a robbery, see § 13A-5-40(a)(2), Code of Alabama 1975. The appellant was sentenced to life imprisonment without the possibility of parole.
The appellant contends that the trial court erred in denying his motion made pursuant to Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, the appellant maintains that in determining that the defense failed to establish a prima facie case of discrimination, the trial court relied solely on a comparison of the percentage of black persons on the jury with the percentage of black persons on the venire from which the jury was struck, a practice now expressly disapproved by the Alabama Supreme Court in Ex parte Thomas, 659 So.2d 3
(Ala. 1994).
The record reflects that after the jury was struck, the following transpired:
 "THE COURT: Okay, let the record show that Mrs. Turner has informed me that the striking process is completed and that the jury has been selected. Mr. Broome states he has a motion he wishes to be considered before the jury is seated. We are outside the presence of the jury panel. Okay, Mr. Broome?
 "MR. BROOME [defense counsel]: Judge, we would make a motion that the jury panel that was selected is not, in fact, our panel. Under Batson and the line of cases that follows that the state has shown a systematic pattern of using the state's peremptory challenges to exclude otherwise qualified and unbiased persons from the jury solely because they were black. And we believe that the Supreme Court in a line of cases has said that that practice significantly gives the — keeps a black from having a significant opportunity to participate in civil life in the jury system as we know it in the United States. The venire was composed of 63 men and women of which, if my math's correct and we got them all down, 18 were black.
 "THE COURT: Okay. Go through and point out the ones to me who are black.
"MR. BROOME: Have you got that?
 "MR. ADAMS [defense counsel]: Judge, would it be easier if he calls out the way we kept up with it as the number of black strikes?
 "THE COURT: Well, if you want to lay out a motion you're going to have to inform me which ones of the 63 were black and then —
 "MR. BROOME: I can do that, Judge. Number eight was black. Thirty-nine —
"THE COURT: Just a minute.
"MR. BROOME: Do you want them by name or number?
 "THE COURT: I would like them in order or else slow down one or the other. *Page 886 
"MR. BROOME: Number eight, F.B.
"THE COURT: Okay.
"MR. BROOME: Number 39, J.M.
"THE COURT: Okay.
 "MR. BROOME: Number 58, R.T. Number 25, B.H. Number 35, G.M. Number 38, F.M. Number 53, J.S. Number 59, R.W. Number 44, E.P. Number 24, L.H. Number 11, A.B. Number 28, W.I. Number 62, J.W.
 "Those were the ones Your Honor, that the state struck, which would be a total of 13. There would be five that were not struck. Number three, L.B. Number six, C.B. Number 26, E.H. Number 41, J.O. Number 47, C.R. That would be 18, I believe, Your Honor. There was 13 struck and 5 on the jury panel they struck.
 "It's my understanding that this county, and please correct me if I'm wrong, is approximately between 25 and 30 percent black. If that's wrong —
 "MR. LEMLEY [assistant prosecutor]: It is my understanding it is between 24 and 27 percent black.
 "MR. BROOME: I could concede to that, Your Honor, that approximately a little less than 30 percent, of the venire were, in fact, black, 18 out of the 63, and that the state struck over 70 percent of the blacks that were on the jury panel. And it would be our contention it's for no other reason than than because of their race.
 "Several of the blacks that were struck never answered any question whatsoever other than during the initial introduction when they stated their name and address and where they worked and where their spouse worked. And we would like for them to justify the strikes that they made of those 13 strikes.
 "THE COURT: Mr. Field [prosecutor]? Mr. Hubbard [assistant prosecutor]? Either one of you?
 "MR. FIELD: Yes, sir. I'm sure Your Honor is aware of is aware of the fact that once we're required to justify the strikes the appellate courts have indicated that they will not even consider whether or not Batson applied. And we feel very strongly about getting a favorable ruling as far as Batson is concerned before we're required to do anything else. And the reason for that is this: That there is a higher percentage of blacks left on this jury than was on the venire.
 "Now, he can count up to 18. He ought to be able to count up to how many blacks are on that jury and how many whites are on that jury. And if my calculations are correct the percentage that's left on the jury is higher than the percentage that's on the total panel. So I don't see where he's got a Batson challenge.
 "MR. HUBBARD: Also, Your Honor, the percentage of blacks that are on the jury is a higher percentage of blacks if you consider that there is a quarter — population quarter of a black population in Tuscaloosa County [sic]. There is a higher percentage on that jury than there are blacks in Tuscaloosa County as compared to the entire population.
 "The defendant has failed, Your Honor, to make a prima facie showing that there was discrimination on the part of the state. Now, absent that, a showing on the part of the defendant, the state is not required to justify any of its strikes. And once the state begins to justify those strikes then, if Your Honor requires us to do that, that completely eliminates the appellate court from even looking at the question whether or not there was a prima facie case to begin with. So we strongly urge the court to find, as there is Judge, no discrimination has been shown on the part of the state. No prima facie case has been shown on the part of the state.
 "We fully admit that we struck, I suppose, 12 or 13 blacks. We also struck some 12 or 13 whites. There are no black alternates on this particular jury so that there will be 5 blacks unquestionably that will sit on this panel and decide this boy's guilt or innocence, and that's going to be 5 out of 12. And the percentage, Your Honor, based on the knowledge that we have in Tuscaloosa County is extremely high as far as the ratio between the blacks and whites on this particular jury.
 "It's almost as telling, Judge, to me that the defense struck absolutely no blacks on *Page 887 
this jury. And I think it's important for the appellate court to note that the reason that there were no blacks struck on this particular jury in the state's opinion is simply so that they can bring forth this motion and indicate that the state had, in fact, practiced discrimination. And that's become the practice and it's an unfortunate practice in this particular situation. Few appellate courts have attempted to show that they want discrimination stopped, which it should be stopped, but it should not be used as a vehicle. Batson should not be used as a vehicle to allow this defendant or any other defendant an opportunity to slide out of a criminal case via the strategy of his defense team by saying that we won't strike any blacks, we know that there are some blacks that the state is going to have to strike and therefore we'll be able to raise this motion; we'll be able to convince the court that there was prima facie discrimination and therefore will require the state to have to give reasons; if we require them to have to give reasons for that then the appellate court cannot [sic] then look back and say, `Well, we're not going to decide whether or not there was prima facie discrimination or not because the trial judge required the state to give reasons and we're going to overlook whether or not there was prima facie discrimination. That's the state of the law as I understand it at the present time.
 "THE COURT: That's correct. All right. For the purposes of the record, of course, the record's clear. But to make sure it's abundantly clear the defendant in this case is white. He is not a member or any minority group, let alone a member of any minority group that is being question at this point. So we're not pursuing a Batson motion per se. If any right's being asserted Mr. Broome asserting the 14th Amendment right of a juror. I have not run the percentages but from what you say you concede that Tuscaloosa County would be 25 percent black, roughly?
"MR. BROOME: Yes, sir.
 "THE COURT: That 18 out of 63 jurors available for jury service are black. That's the panel from which we struck after, of course, two challenges for cause. That we have a jury composed of 12 principal jurors [and] two alternates that is comprised of five blacks, the remainder white or at least nonblack, I assume white. We had some — at least one other ethnic minority group available for jury service.
"MR. HUBBARD: He was struck, Judge.
 "THE COURT: Okay. That of the 14 jurors five of the 12 principal jurors are black. That brings the percentages of black participation on this jury panel and assuming you look at the principal jury panel almost 50 percent of the jury panel that has been selected with the two alternates, would exceed the general racial makeup of Tuscaloosa County would be about 30 — roughly 34, 35 percent I guess and exceeds the racial makeup of the jury panel as a whole or at least does not — would not be any less than that. I don't see where there has been a prima facie showing of racial striking on the part of the state.
 "In regard to Mr. Hubbard's remarks about defense tactics, I think it is clear that it is the norm in this state now under Batson and the cases that have followed Batson that it is a defense tactic of course not to strike any members on any minority group because that weakens their argument at this point in the trial. But why you struck and why you didn't strike, of course, that's your business. The thing is there has not been a prima facie showing that would trigger inquiry by the court of the state as to the mental processes that went into the striking process.
"Okay, anything further?
"MR. HUBBARD: No, sir. Thank you, Judge."
(R. 297-306) (Emphasis added.)
From our review of the record, it appears that the trial court may have based its ruling that the appellant failed to establish a prima facie case of discrimination solely on the fact that the jury was composed of a higher percentage of blacks than sat on the venire, which, as noted above, is a practice now condemned by the Alabama Supreme Court in Ex parte Thomas, supra. *Page 888 
 "`Before the release of the Alabama Supreme Court's definition in Thomas, this court had consistently held that when a Batson objection was raised by a black defendant and a greater percentage of African-Americans sat on the jury than the percentage that sat on the venire no prima facie case of discrimination had been established. Harrell v. State, 571 So.2d 1270 (Ala. 1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991). See also Raspberry v. State, 615 So.2d 657
(Ala.Cr.App. 1992); Ashley v. State, 606 So.2d 187
(Ala.Cr.App. 1992); Jones v. State, 603 So.2d 419
(Ala.Cr.App. 1992); Hood v. State, 598 So.2d 1022
(Ala.Cr.App. 1991).'
Arnold v. State, 668 So.2d 109 (Ala.Cr.App. 1995).
 "In Thomas, the Alabama Supreme Court addressed the question, `[M]ay a defendant make a prima facie case of discrimination by showing that the prosecutor used a large number of his peremptory challenges to engage in a pattern of striking blacks from the venire, even though a higher percentage of blacks ultimately sat on the jury than on the venire?' Thomas, 659 So.2d at 4. The Court held that in certain instances, a prima facie case of discrimination can be made by showing that the prosecutor used a large number of its strikes to remove blacks, notwithstanding the fact that a larger percentage of blacks sat on the jury than sat on the venire. In reaching his conclusion, the Court expressly disapproved of the following statement in Harrell v. State, 571 So.2d 1270, 1271-72 (Ala. 1990) cert. denied, 499 U.S. 984, 111 S.Ct 1641, 113 L.Ed.2d 736 (1991) (`Harrell II'); `"[w]hen the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created.'"
"In Thomas the Court reasoned:
 "`A skilled but racially biased attorney could learn to manipulate the strike process so as to be able to strike a certain number of blacks from the venire on the basis of race, and yet not be called to account for the racially based strikes, as long as some blacks were left on the jury. Such a result should not be approved.
 "`"`[A] prima facie case may be made where relevant circumstances indicate an inference of purposeful race discrimination no matter that one or more black persons may remain on the jury.' United States v. Wilson, 884 F.2d 1121, 1123 (8th Cir. 1989). `The striking of one venireperson for a racial reason violates the Equal Protection Clause, even when valid reasons for striking some black jurors are shown.' Williams v. State, 548 So.2d 501, 507
(Ala.Crim.App. 1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989). `Of course, the fact that blacks are ultimately seated on the jury does not necessarily bar a finding of discrimination under Batson[,] see [United States v.] Battle, 836 F.2d [1084] [at] 1086 [(8th Cir. 1987)], but the fact may be taken into account in a review of all the circumstances as one that suggests that the government did not seek to rid the jury of person who shared the defendant's race.' United States v. Young-Bey, 893 F.2d 178, 180 (8th Cir. 1990)."
 "`Mitchell v. State, 579 So.2d 45, 48
(Ala.Crim.App. 1991), cert. denied, 596 So.2d 954 (Ala. 1992).
 "`"[T]he Equal Protection Clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race, a practice that forecloses a significant opportunity to participate in civic life. An individual juror does not have a right to sit any particular petit jury, but he or she does possess the right not to be excluded from one on account of race."
 "`Powers v. Ohio, 499 U.S. 400 at 409, 113 L.Ed.2d 411, 111 S. Ct. 1364 at 1370 (emphasis added [in Ex parte Thomas]).
 "`The language in Harrell II has unfortunately resulted in a possibility that *Page 889 
prosecutors may violate the Equal Protection Clause and exclude blacks from jury service solely on the color of their skin. We disapprove the statement in Harrell II indicating that "[w]hen the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created," 571 So.2d at 1271, to the extent that it has been construed to preclude a finding of a prima facie Batson violation where the attorney engaged in a pattern of striking blacks from the venire. We disapprove this statement in Harrell II as it has been applied in these instances, because such applications prevent a defendant from using a factor indicating
discrimination that was approved in both [Ex parte] Branch[, 526 So.2d 609 (Ala. 1987),] and Batson. Such an application was not the Court's intent. In Ex parte Bird, 594 So.2d 676 (Ala. 1991), decided more than a year after Harrell II, this Court did not construe the dictum of Harrell II to mean that a defendant cannot make a prima facie case if the percentage of blacks on the jury is greater than the percentage that was on the venire. Instead, the Bird Court stated only that such a statistical showing weakens a prima facie case. See, 594 So.2d at 680-81.'
Thomas, 659 So.2d at7-8. (Emphasis in original.)"
Hodges v. State, 673 So.2d 783, 783-85
(Ala.Crim.App. 1995).
This Court must abide by the holdings of the Alabama Supreme Court. § 12-3-16, Code of Alabama 1975. It appears that the trial court considered only the racial composition of the jury in determining that the defense failed to make a prima facie showing of discrimination; therefore, we must remand this case to the trial court for that court to conduct a hearing to determine whether, considering factors in addition to the racial composition of the jury, the appellant made a prima facie showing of racial discrimination under Batson, Ex parte Branch,526 So.2d 609 (Ala. 1987), and Ex parte Thomas. If the trial court finds that the defense has made such a showing, the burden then shifts to the state, and the state must give the reasons for its strikes of black veniremembers. The court should follow the procedure outlined in Branch. If the trial court determines that the appellant has failed to make a prima facie showing, it shall make written findings of facts and conclusions of law, stating the specific reasons for its determination. On remand, the trial court is authorized to grant the appellant the relief, if any, to which he may be entitled. See, McClain v. State, 659 So.2d 164
(Ala.Cr.App. 1994). The trial court shall take the necessary action to ensure that the circuit clerk makes due return to this court at the earliest possible time within 84 days from the date of this opinion.
We pretermit discussion of the appellant's other issues at this time.
REMANDED WITH INSTRUCTIONS.
ALL JUDGES CONCUR.
 ON RETURN TO REMAND
The appellant, Gerald Homer Ingram, Jr., was convicted of the capital offense of murder during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala. Code 1975. He was sentenced to life imprisonment without parole.
 I.
On February 9, 1996, we remanded this case to the trial court with instructions for that court to conduct further proceedings to determine whether the appellant made a prima facie showing of racial discrimination by the state in its use of peremptory strikes in the jury selection process, see Batson v. Kentucky,476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986), taking into account factors in addition to a comparison of the percentage of black persons who ultimately served on the jury with the percentage of black persons on the venire from which the jury was struck. Facts relevant to the appellant's Batson motion were contained in our original opinion. See Ingram v. State,729 So.2d 883 (Ala.Cr.App. 1996). Discussions of other issues *Page 890 
raised by the appellant on appeal were pretermitted at that time. Id.
The trial court has complied with our directions and has filed the following return to our remand order:
 "This case was remanded to this Court by the Court of Criminal Appeals of the State of Alabama with instructions. The instructions were for this Court to conduct a `Batson hearing' necessitated by an intervening Alabama Supreme Court holding that statistical data could not be the sole basis for a trial court denying a Batson motion. While the record in this case may appear that a purely statistical analysis was utilized by the Court in passing upon the defendant's Batson motion, nothing is further from reality. That issue will be addressed below.
 "Upon this case being remanded, the undersigned personally contacted both the District Attorney and the defendant's attorney and inquired as to whether a formal hearing need be held. The Court's position is that the record reflects the striking process and nothing more need be said or argued unless the court finds that a prima facie showing has been made by the defendant and the State must therefore respond. Neither side has requested a formal hearing.
"On consideration, the Court finds as follows:
 "1. The undersigned observed voir dire and the entire striking process. Nothing even remotely appeared to be racially, ethnically, or gender based. In fact, it appeared that the State went out of its way to ensure a completely fair, unbiased and impartial striking process.
 "2. The undersigned has worked with the District Attorney who tried this case since 197Z and the Assistant District Attorney who was involved as co-prosecutor since 1977. During that period of time, I have had the opportunity to observe their prosecuting of numerous cases and the striking of a multitude of juries. Neither has ever given any indication of exercising race, ethnic or gender based striking. In fact, the Office of the District Attorney for the Seventh Judicial Circuit has, from all that appears, had a policy of seating jurors based on conscientiously held, race-neutral perceptions of juror qualifications relevant to the individual case. Further, the reputation of the District Attorney, who was previously in private practice and had previously served as City Attorney for the City of Anniston and as City Manager for the City of Anniston during the times of social unrest in the South in the late [19]60's and the [19]70's, is that of being racially and socially progressive, an attitude that this Court has observed to have permeated his tenure as District Attorney.
 "3. Taking into consideration all the relevant factors that the Court would consider in the initial consideration of a Batson motion, including but not limited to: voir dire, striking procedures and patterns, similarities and dissimilarities of persons seated and struck, the defendant's striking process, the ultimate jury seated, including alternates, and other relevant matters observed by the Court during the striking process, and using the undersigned's bench experience in observing these attorneys and others select juries, there was nothing observed or from which the Court could infer improper in the State's exercise of its peremptory strikes. This is certainly supported by the statistical data cited by the Court in the original record herein.
 "Once again, this Court wishes to underscore the plight of the trial bench in cases such as this one where it is obvious that defendant's counsel purposely avoids striking any minority member of a jury venire simply to make it appear that the State is doing quite the opposite. This is particularly true in capital litigation. It is a common, even if questionable, trial tactic that does a disservice to the trial process."
It is clear from the trial court's order that the trial court, in determining that the appellant had failed to make a prima facie case of discrimination, considered factors in addition to a comparison of the percentage of black persons on the jury with the percentage *Page 891 
of black persons on the venire from which the jury was struck. A trial court's ruling on a Batson motion is entitled to great deference on appeal. Batson, 476 U.S. at 98, fn. 21,106 S.Ct. at 1724, fn. 21, 90 L.Ed.2d at 89.
 "`"The trial judge `plays a "pivotal role" in determining whether a prima facie case has been made under Batson because he or she observes the voir dire procedure firsthand and is in a far better position than we to assess the prosecutor's decisions.' . . . An appellate court may reverse the trial court's determination that the prosecutor's peremptory challenges were not motivated by intentional discrimination only if that determination is `clearly erroneous.'"'"
Weaver v. State, 682 So.2d 488, 491 (Ala.Cr.App.), cert. denied, 682 So.2d 493 (Ala. 1996).
 II.
The trial court's ruling on the appellant's Batson motion was not "clearly erroneous."
The appellant, who was 15 years old at the time of the offense, also contends that his motion to suppress the statements he made to police in Louisiana should have been granted because, he says, the police failed to inform him, before questioning him, that if he had the right to communicate with his counsel, a parent or a guardian and that, if necessary, reasonable means would be provided for him to do so. Rule 11(B), Ala. R. Juv. P.,[1] enumerates the rights of a child who is in custody but who has not yet been questioned (the so-called "SuperMiranda"
rights). It provides as follows:
 "Before the child is questioned about anything concerning the charge on which the child was arrested, the person asking the questions must inform the child of the following rights:
"(1) That the child has the right to counsel;
 "(2) That if the child is unable to pay a lawyer and if the child's parents or guardian have not provided a lawyer, one can be provided;
 "(3) That the child is not required to say anything and that anything the child says may be used against the child;
 "(4) That if the child's counsel, parent, or guardian is not present, then the child has the right to communicate with them, and that, if necessary, reasonable means will be provided for the child to do so."
Subsections (1), (2), and (3) of Rule 11(B) are "substantially the same as the warnings required in Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." Ex parte Whisenant,466 So.2d 1006, 1007 (Ala. 1985). In addition to the standardMiranda warnings, subsection (4) mandates that a juvenile also be informed that he can communicate with counsel, a parent, or a guardian.
The facts relevant to the appellant's claim are as follows: On February 13, 1990, the appellant was driving the victim's car on Interstate 20 in Louisiana when the car ran out of gas. He abandoned the car and began walking along the interstate. A hitchhiker, whom the appellant had picked up at some point between Anniston, where the victim had been murdered the day before, and Louisiana, and who was apparently with the appellant when the car ran out of gas, reported the appellant to the police and informed them that the appellant was armed and that there were weapons in his car.
The appellant was seen by Louisiana law enforcement officials walking along the interstate and, after a chase, he was apprehended at approximately 12:00 p.m. on February 13, 1990. Trooper Michael Evans of the Louisiana State Police testified that after he had the appellant in custody, he read him hisMiranda rights. Trooper Evans further testified *Page 892 
that he asked the appellant his name and his age and that once he learned that the appellant was 15 years old, he did not question the appellant, because, according to Trooper Evans, under Louisiana law a juvenile cannot be questioned without counsel, a parent, or a guardian present.
The appellant was subsequently transported to the Richland Parish Sheriff's Office in Rayville, Louisiana. Upon his arrival at the sheriff's office between 12:00 p.m. and 12:30 p.m., Robert Buckley, who at that time was a Master Trooper with the Louisiana State Police, attempted to contact his parents. Trooper Buckley testified that he was unable to reach either the appellant's mother, who lived in Georgia, or the appellant's father, who lived in Mississippi.
Trooper Buckley further testified that when he was unable to reach the appellant's parents, he went to the district judge and requested that an attorney he appointed to represent the appellant. An attorney was in fact appointed. The appellant consulted with his appointed attorney for approximately one to one and one-half hours before the questioning began. Trooper Buckley testified that he requested that an attorney be appointed to represent the appellant because the procedure in Louisiana for taking statements from a juvenile provided that the juvenile cannot be questioned unless a parent, guardian, or counsel is present.
Trooper Buckley further testified that after the appellant consulted with his attorney, the appellant, accompanied by his attorney, was read his Miranda rights. The appellant stated that he understood those rights and that he wanted to waive them. The record reflects that the appellant's attorney had, before police questioned the appellant, explained to the appellant his constitutional rights in detail. The appellant then proceeded to make a statement to the police, in which he admitted to killing the victim and to stealing her car. Trooper Buckley testified that the appellant was not threatened or coerced into giving a statement and that he was not promised anything in return for talking to the police. Trooper Buckley also testified that he was finally able to contact the appellant's mother some time after the appellant had given his statement. He further testified that the appellant talked to his mother. Trooper Buckley could not remember whether the appellant's mother was unwilling or unable to come to Louisiana, but, said Trooper Buckley, the appellant was never prevented from contacting his parents.
The record also reflects that on the following day, February 14, 1990, the appellant, still accompanied by his attorney, gave another statement, which was basically identical to his first statement. At the time of the appellant's second statement, law enforcement officials from Alabama were also present. Again, before any questioning, the appellant was read his Miranda
rights, which he said he understood, and the appellant voluntarily waived his rights. In addition, because the Alabama authorities were present at the time of the appellant's second statement, the appellant was also again informed of his right to communicate with counsel, a parent, or a guardian. Trooper Buckley again testified that the appellant was not threatened or coerced into giving the second statement, and that he was not offered any reward or hope of reward if he talked to the police.
After conducting a pretrial hearing on the appellant's motion to suppress, the trial court denied the motion, finding:
 "[I]n reviewing the evidence — I've read the statements, I've looked at all the exhibits, in reviewing the evidence and considering the testimony the court finds as follows. One, that [the appellant] was legally, lawfully arrested on probable cause. Both, in fact, arrested apparently under Louisiana law for an offense committed within the presence of the Trooper as well as probable cause for the commission of felonies both in the state of Louisiana and the state of — in the state of Louisiana [sic]. Shortly after his detention the authorities of Louisiana had a right to detain him based upon probable cause for offenses committed in Alabama as well as upon a juvenile detention order that had been transmitted through the National Crime Information Center computer at the request of the Georgia authorities. The court finds that at no time was [the appellant] in any way *Page 893 
improperly treated by the authorities in Louisiana. The court, specifically finds that Louisiana law in regard to the taking of statements from juveniles as the court understands that law to be was met. The court further finds that requirements of Alabama law in the securing of those statements were taken. There is no indication whatsoever that [the appellant's] constitutional or statutory rights were in any way violated by the authorities in Louisiana in his arrest or in the securing of these two statements that are in issue today.
 "The court further finds that an attorney — well, first of all the court further finds that an attempt was made to communicate with those persons even required under Alabama law to be communicated with upon the arrest of a juvenile; there was an attempt to make that communication, to no avail. That the Louisiana authorities did use reasonable diligence in attempting to contact [the appellant's] parents. Failing to do so, the court finds that the fallback position in Louisiana is substantially the same as that in Alabama, that an attorney be provided or allow [the appellant] to communicate with an attorney. The procedure went even further than that and he was actually provided with a court-appointed attorney. The court finds that [the appellant] voluntarily and knowingly waived his constitutional rights and that the statements that are in issue are not due to be suppressed.
 "In fact, as sort of a postscript, I would like to note in the record and acknowledge publicly that I am impressed by the professionalism of the officers in Louisiana, specifically, the Trooper that is involved, now Sheriff Buckley, and Chief Deputy in taking these statements. There is no indication whatsoever that any coercion, intimidation, or other improper method was used in the securing of these statements. They are not due to be suppressed."
(R. 191-93.)
During the trial, when evidence was again presented concerning the motion to suppress, the trial court further found:
 "Based on the evidence that was presented at the earlier hearing . . . and also considering the new evidence and testimony that's been presented at this hearing, I'm going to overrule the defense motion to exclude the testimony or the confessions or to suppress those statements. And I'm going to note specifically this: First of all, I have serious reservations about whether a procedural nicety or rule in the state of Alabama has extraterritorial effect in the state of Alabama or could under any reasonable system of law. That's one.
 "Two, it appears that the law of the state of Louisiana was strictly complied with.
 "Three, it appears that reasonable efforts were made to contact [the appellant's] parents. And as I understand the testimony today and probably I guess considering some reasonable inferences that you can draw from that testimony, while he may not have been estranged from both parents, both parents are obviously separated. They live in — one lives in the state of Georgia, one in the state of Mississippi. But reasonable efforts were made to contact those people. When that failed he was given the right to appointed counsel.
 "Now, not only does that comply with the law of the state of Alabama — I mean the state of Louisiana. I think that certainly complies with both the letter and spirit of the enhanced Miranda rights a juvenile enjoys in the state of Alabama.
 "I find no reason whatsoever to feel that [the appellant's] statements were not completely voluntary and in full knowledge and understanding of his constitutional rights and his statutory or procedural rights as afforded him as a juvenile by the law of the state of Louisiana and the law of the state of Alabama."
(R. 678-81.) We agree with the trial court.
Although the appellant was not specifically advised that he had the right to communicate with counsel, a parent, or a guardian, such a warning is a "conditional advisement" which must be given only if the juvenile's counsel, parent, or guardian is not present. Taylor v. State, 491 So.2d 1042, 1044 (Ala.Cr.App. 1986); Payne v. State, 487 So.2d 256 (Ala.Cr.App. 1986). If any one of *Page 894 
these three parties is present, then Rule 11(B)(4) does not apply. Here, the appellant was not questioned until an attorney had been appointed for him. The appellant was allowed to meet with his attorney for approximately one hour before questioning began, and the appellant's attorney was present when he gave both statements to police.
In Taylor, supra, the juvenile defendant claimed, as the appellant does in this case, that he was not advised of his right to communicate with his counsel, a parent, or a guardian as required by subsection (4) of what is now Rule 11(B). However, the defendant's parents were present when he was read his Miranda rights and then waived those rights. The court inTaylor held:
 "[B]ecause the appellant's parents were already present with him, subsection (4) does not apply. Subsection (4) is a conditional advisement; only "if his counsel, parent, or guardian is not present'
must he be advised that he has a right to communicate with them. Because the parents were present and communicating with the appellant, Rule 11[(B)](4), A.R.J.P., did not apply to the appellant;."
Taylor, 491 So.2d at 1044 (emphasis in original). Just as in Taylor; the appellant's counsel, one of those persons specified in Rule 11(B)(4), was present when the appellant was advised of, and then waived his Miranda rights.
Therefore, we find, as did the trial court, that Rule 11(B) was complied with in the appellant's case. In fact, the appellant was afforded more protections in Louisiana than he would have been had he been questioned in Alabama. Under Louisiana law, as Trooper Buckley testified to at trial, a juvenile may not be questioned in the absence of counsel or a parent or a guardian. Before a juvenile's statement may be admitted at trial in Louisiana, the state must meet a heavy burden by showing "that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare before he waived his right to counsel and privilege against self-incrimination." State v. Carter,569 So.2d 1025, (La.App.3Cir. 1990), writ denied, 575 So.2d 389
(La. 1991), citing State of La. in the Interest of Dino,359 So.2d 586, 594 (La.), cert. denied, 439 U.S. 1047, 99 S.Ct. 722,58 L.Ed.2d 706 (1978) (Louisiana case outlining the procedural requirements for obtaining a statement from a juvenile).
In contrast, Alabama law, specifically Rule 11(B)(4), does not require that a juvenile be accompanied by counsel, a parent, or a guardian before being questioned by the police: the juvenile must only be advised that he has the right to communicate with any of those persons if he so desires before submitting to any questioning by law enforcement officials.
Based upon the foregoing, the appellant's claim that his statements to police were not voluntarily made is without merit, and the trial court did not err in admitting them into evidence.
The appellant also contends that his statements were not voluntarily made because, he says, he was not informed by the Louisiana police that he could be charged with a capital offense in Alabama. This issue is being presented for the first time on appeal and thus is not preserved for review. "In order for this court to review an alleged erroneous admission of evidence, a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be statedand a ruling on the objection must be made by the trial court."Goodson v. State, 540 So.2d 789, 791 (Ala.Cr.App. 1988) (emphasis added).
However, even if the appellant had properly raised this issue at trial, he would not be entitled to any relief. There is no requirement that a suspect, before giving a statement, must be informed of the possible charges that he could be facing. The appellant was told by the police that he was being questioned about a murder in Calhoun County, Alabama, in which the victim's car had been stolen. We find no merit to the appellant's claim.
The appellant further contends that his statements were not voluntarily made because, he says, he did not knowingly waive his constitutional rights. Specifically, *Page 895 
he contends that the attorney appointed to represent him in Louisiana, who was present with the appellant when both statements were given, was ineffective because, he says, the attorney failed to inform him that anything he told the police in Louisiana could be used against him in Alabama. In support of his contention, the appellant cites this court to a portion of his testimony in the record, which was given for the limited purpose of the hearing on his motion to suppress his statements. In that testimony the appellant claimed that his appointed attorney in Louisiana never explained to him that anything he told the police in Louisiana could be used against him on a capital murder charge in Alabama. This testimony was insufficient, to preserve for review the appellant's claim on appeal that his counsel was ineffective. The appellant did not specifically argue this ground to the trial court, either in his motion to suppress, in arguments at trial on the motion to suppress, or in his motion for a new trial. Furthermore, even assuming that this claim was properly preserved for appellant review, the record is replete with evidence that the appellant's appointed attorney, as well as the Louisiana officials, explained the appellant's rights — including his right to remain silent and that anything he said could be used against him in court — to him on numerous occasions and that the appellant said that he understood those rights, that he wanted to waive them, and that he wanted to make a statement. Moreover, in denying the appellant's motion to suppress, the trial court found, after considering the appellant's testimony and his demeanor on the witness stand, that his assertions at trial were "less than credible," (R. 681.) We find no merit to this claim.
 III.
The appellant's first contention is that the state's evidence was insufficient to support his conviction. He preserved this issue for review by motions for judgment of acquittal, which were made at the conclusion of the state's case-in-chief and at the conclusion of all of the evidence, and in a subsequent motion for a new trial.
The appellant was convicted of capital murder for the robbery-murder of Paige Goodwin. See § 13A-5-40(a)(2), Ala. Code 1975. The appellant does not contest the facts showing that he shot and intentionally killed Goodwin, and he does not contest the facts showing that he stole Goodwin's automobile. He does, however, contend that the state failed to prove that the murder was committed during the commission of a robbery in the first degree because, he argues, the taking of Goodwin's car was an "afterthought" to her murder.
"In a challenge of the sufficiency the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate court will not substitute its judgment for that of the trier of fact." Maddox v. State,620 So.2d 132, 133 (Ala.Cr.App. 1993). Conflicting evidence presents a jury question not subject to review on appeal, provided that the state's evidence established a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied,387 So.2d 283 (Ala. 1980). A trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v.State, 447 So.2d 199 (Ala.Cr.App. 1983). Furthermore:
 "`"A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust."'"
McCollum v. State, 678 So.2d 1210, 1215 (Ala.Cr.App. 1995) quoting Cox v. State, 500 So.2d 1296 (Ala.Cr.App. 1986), quoting in turn other cases.
The evidence showed that on the night of February 12, 1990, Goodwin was shot in the head and killed as she stood in the driveway of her residence. At trial, Goodwin's neighbor Cynthia Daughtery testified that she saw the appellant several times on the days preceding the shooting walking up and down the *Page 896 
street on which Goodwin lived. Daughtery stated that on the day of the shooting, she saw the appellant walking in front of Goodwin's house.
Goodwin's car was taken from her driveway on the night of the shooting. The day following the shooting, the appellant was apprehended in Louisiana after he abandoned Goodwin's car on the interstate. The appellant gave statements to Louisiana police, and later to Alabama law enforcement officials, in which he confessed to shooting Goodwin and to taking her car. The appellant's statements were admitted in evidence at his trial.
The appellant testified at trial and admitted shooting Goodwin. He stated that on the night of the murder, he saw Goodwin's car parked in her driveway and he saw Goodwin inside her house. Armed with a rifle, he walked around Goodwin's house several times. The appellant stated that when Goodwin came outside, apparently to go somewhere in her car, he fired his rifle at her. When the first shot missed Goodwin, the appellant fired again and, this time, the bullet struck Goodwin in the head, fatally wounding her. The appellant said that when Goodwin fell to the ground in her driveway he approached her, took her car keys out of her hand, and fled in her car. In his statements to police and in his testimony at trial, the appellant maintained that, although he "didn't know [that he] was going to shoot her," he took Goodwin's car because he needed a way to get to Louisiana.
 "`As the Alabama Supreme Court held in Cobern v. State, 273 Ala, 547, 142 So.2d 869 (1962), "the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events." Clements v. State, 370 So.2d 708, 713
(Ala.Cr.App. 1978), aff'd. in pertinent part, 370 So.2d 723 (Ala. 1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App. 1984). To sustain any other position "would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute." Thomas v. State, 460 So.2d 207, 212, (Ala.Cr.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984).
 "`Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, [382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala. 1980)]; O'Pry v. State, [642 S.W.2d 748 (Tex.Cr.App. 1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. [at] 550, 142 So.2d [at] 871 (1962). The defendant's intent to rob the victim can be inferred where "[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events." Thomas v. State, 460 So.2d at 212. . . . See also Cobern v. State; Crowe v. State; Bufford v. State; Clements v. State.'"
Bush v. State, 695 So.2d 70, 118-19 (Ala.Cr.App. 1996), aff'd,695 So.2d 138 (Ala.), cert. denied, ___ U.S. ___, 118 S.Ct. 418,139 L.Ed.2d 320 (1997), quoting Hallford v. State,548 So.2d 526, 534-35 (Ala.Cr.App.), aff'd, 548 So.2d 547 (Ala. 1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342
(1989), quoting, in turn, Connolly v. State, 500 So.2d 57, 63
(Ala.Cr.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986).
Clearly, the evidence presented at trial was sufficient to allow the jury to reasonably conclude that the murder and the robbery were planned in advance and that the appellant intended to steal Goodwin's car when he killed her. Certainly, there was evidence that Goodwin's killing and the taking of her car formed a continuous chain of events and therefore, the taking of Goodwin's car was not, a mere afterthought. Thus, we find that there was sufficient evidence to sustain the appellant's conviction for the capital offense *Page 897 
of murder committed during the course of a robbery.
For the reasons stated above, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, C0BB, BROWN, and BASCHAB, JJ., concur.
[1] Effective May 1, 1994, Rule 11 Ala.R.Juv.P. was amended to clarify the child's rights at different phases of the case. Subsection (A) enumerates the child's rights when the child is taken into custody, while subsection (B) lists those matters a child in custody must be informed of before being questioned. Before this amendment, Rule 11(A) listed the same rights of the child now set forth in Rule 11(s) When the appellant was questioned in this case the preamendment Rule 11(A) was still in effect However, because the current Rule 11(B) is in all important respects the same as the former Rule 11(A), we will refer to Rule 11(B) in this opinion when discussing the rights must be read to a child in custody before questioning.