[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 297 
Seventeen-year-old Antonio Flynn was convicted of murdering Clifford March, a Montgomery taxicab driver, an offense made capital because it occurred during the course of committing a theft, a violation of § 13A-5-40(a)(2), Ala. Code 1975. On July 2, 1998, the trial court imposed a sentence of life imprisonment without the possibility of parole. Flynn raises nine issues on appeal.
 Facts Related To Suppression Of Statement
On June 30, 1995, cab driver Clifford March was dispatched to 738 Iris Lane in Montgomery to pick up a fare. Later that evening his body was discovered on Edda Lane in Montgomery. His taxicab was later found parked at the Carver Community Center.
Anna Thrash, an investigator for the Montgomery County Sheriff's Department, testified that on July 5, 1995, the sergeant in charge of the investigation received information from a "secret witness line" indicating that Antonio Flynn might have been involved in March's murder. Thrash stated that at that point she did not know the nature, if any, of Flynn's involvement in March's murder, or where an interview with Flynn might lead. Between 11:00 a.m. and 11:30 a.m., Thrash and Investigator Angela Burgess went to Flynn's residence. Flynn's mother, Voncille Flynn,[1] was present when the officers arrived. The officers told her that they needed to speak with Flynn about his being on Iris Lane the night of March's murder. She told the officers that Flynn was visiting a residence on Iris Lane. It was established that Flynn dated Valencia Rogers, who lived at 738 Iris Lane, and that Flynn was a good friend of her brother John Rogers, Jr., who also lived at 738 Iris Lane. Mrs. Flynn left in her automobile and brought Flynn home to the awaiting officers. According to Thrash, "[w]e briefly stated that we were investigating the death of a taxicab driver which was pretty common knowledge throughout the community at that point since we had been throughout the community all weekend." R. 381. The officers told Mrs. Flynn and Flynn that "[they] needed to question [Flynn], talk to him about the situation on Iris Lane that involved a taxicab driver, and [they] were going to need him to come to the Sheriff's Department." A short discussion followed about the activity on Iris Lane before the officers left. Mrs. Flynn was present "the whole time." (Vol. 4, R. 12.)[2] Thrash testified that "[a]t that time, [Flynn] accompanied [Thrash] to the Sheriff's Department and his mother chose to stay at home." (Vol. 4, R. 11.) Thrash told Mrs. Flynn that "[Thrash] would call and let [Mrs. Flynn] know what the outcome of the interview was, or [the officers] would let her know what the status was as [the officers] found it out." (Vol. 4, R. 38.) According to Thrash, Flynn "freely and voluntarily" accompanied the officers. (Vol. 4, *Page 298 
R. 11.) Flynn rode with Thrash to the Sheriff's Department; he sat in the front seat and he was not handcuffed.
Thrash stated that she arrived at the police station with Flynn at approximately 12:00 noon. At that time Thrash and the other officers were busy returning numerous telephone calls and obtaining information concerning the investigation. At some point, Thrash obtained general background information, termed "witness locator information," from Flynn. According to Thrash, this consists of information such as an individual's telephone number, and is obtained from everyone brought to the police station for questioning. (Vol. 7, R. 384.) At 12:55 p.m., Burgess administered to Flynn his juvenile Miranda rights. According to Burgess, Flynn appeared to understand his rights, and he signed a waiver of rights form. Thrash stated that she advised Flynn of his rights as a precaution because the investigators did not know where the investigation was going, i.e., who were suspects and who were witnesses. Flynn was not coerced or threatened, and in Burgess's opinion, did not appear afraid. Flynn's first statement began at 1:05 p.m. and ended at 1:11 p.m. (Vol. 7, R. 384.) In this statement, Flynn denied any connection with the murder. However, Flynn placed himself with John Henry Rogers, Jr., who lived at 738 Iris Lane, at the time the robbery and murder occurred. Rogers was also being questioned by the police about March's murder.
After Flynn's statement, the officers took "elimination fingerprints" from Flynn to compare with fingerprints removed from March's taxicab. When that was completed, according to Thrash, Flynn asked about going home, and Thrash told him that "we would take him home as soon as [we got] through with the information that [we] were having to follow up on, which entailed gathering other people and questioning other people, and that for him to bear with us, you know, and [Flynn] volunteered to continue, as information came to us, to go over that information with us." (Vol. 4, R. 42-43.) However, according to Thrash, after being fingerprinted, Flynn was "free to wander and go if he needed to go," (Vol. 4, R. 42), but [Thrash] was "not necessarily free to take [Flynn] home until [her] Sergeant said that it was okay for [her] to, until we went over . . . whatever we had gathered and compared them." (Vol. 4, R. 41.) "But [according to Thrash] as far as being free to leave, he could have walked out or called someone to come get him, or his mother could have come got him." (Vol. 4, R. 47-8.)
At some point before 3:30 p.m., information was received from a telephone secret witness that "seemed to indicate that the suspects were Muffin and Teeto." Motion to Suppress R. 40. "Muffin" is a nickname for Flynn and "Teeto" is a nickname for John Henry Rogers, Jr.
At 3:30 p.m., Thrash returned a telephone call to Mrs. Flynn. Thrash did not recall telling Mrs. Flynn that Flynn was a suspect at that time. According to Thrash, "the only thing I could tell her at that point was as soon as the interview could be concluded and we had the approval to return him home, as far as I was concerned, we would, as long as nothing else developed." (Vol. 4, R. 41.) Thrash explained that she referred to the "completion" of the "interview" with Flynn when talking to Mrs. Flynn because
 "we were in fact still asking him about the additional information coming to our attention throughout the evening. We were working on several different things and had quite a bit of over-the-weekend things that had built up that we were having to deal with all in that one day, because we had had such a long holiday weekend and because our resources were so limited. It was a continuing thing, whereas information became available to us, we approached him with it, and as other people were being brought in and they added information to the information that we knew, it was an informal contact with him, just to see *Page 299 
if he could shed some light on who these people were, where this information was coming from."
(Vol. 4, R. 46-47.)
Close to 4:30 p.m., information was received confirming that Rogers's fingerprints were found inside March's taxicab. Thrash confronted Rogers with this information and Rogers indicated that he, Flynn, and Reggie Morrell were involved in the murder. According to Thrash, at that point, shortly after 4:30 p.m., based on Rogers's statement and Flynn's assertion placing himself with Rogers at the time of the murder, she immediately left Rogers and secured Flynn, because, according to Thrash, at that point, Flynn was implicated in the murder and no longer free to leave. At this time Thrash testified that she informed Flynn that he was under arrest, and she placed him in handcuffs. (Vol. 4, R. 51.) However, Thrash stated that she did not inform Flynn of what crime he was charged with because, she stated, her contact with him at that point was very brief and "he knew we were investigating the murder of the taxicab driver." (Vol. 4, R. 52.)
Robert Means, an investigator for the Montgomery Sheriff's Department, testified that he was involved in investigating March's murder. He stated that on the afternoon of July 5, 1995, Officer Thrash informed him that she had received information from Rogers implicating Flynn in the murder. She asked Means to interview Flynn concerning the murder. According to Means, Flynn had not been charged with a crime when he began the interview. He stated that the interview took place in the interrogation room and he did not remember whether Flynn was handcuffed. Means stated that at 5:40 p.m., prior to questioning Flynn, he advised Flynn of his juvenile Miranda rights, and out of an abundance of caution, he advised Flynn of his adult Miranda rights at 5:46 p.m. According to Means, Flynn signed waivers for both and appeared to be giving a statement voluntarily. Flynn's second statement began immediately following receipt of his adult Miranda rights and concluded at 6:45 p.m. Flynn's admitted that he agreed to participate in the robbery and murder of March on the condition that he did not have to pull the trigger.
Voncille Flynn testified that the officers came to her house and told her that they were taking Flynn for questioning but did not tell her what they wanted to question Flynn about. She stated that she was not told that Flynn was a suspect in a capital murder case. Mrs. Flynn stated that Flynn volunteered to go with the officers "because they [said] they [were] taking him in for question[ing] and they would bring him back in a few minutes." (Vol. 4, R. 112.) According to Mrs. Flynn, before the officers left with Flynn, she asked the officers to "let her know what was going on." (Vol. 4, R. 112.) Mrs. Flynn stated that when she did not hear from the officers after about an hour or two, she "called and called and called" the police trying to find out what was going on with her son. (Vol. 4, R. 112.) She stated that all she found out was that the police where "still questioning him" and that the police would bring him home when "they got through question[ing] him." (Vol. 4, R. 113.) Around 4:00 p.m., when Flynn had not come home, she telephoned Tim Halstrom, an attorney, and asked him to see what was going on. Mrs. Flynn stated that someone called her around 8:30 or 9:00 p.m., and told her that Flynn was being charged with murder. At that time she went to the police department and spoke with Flynn.
Flynn filed a motion to suppress his pretrial statements made to investigators, contending that his rights had been violated because in taking those statements the State did not comply with the Alabama Rules of Juvenile Procedure in several instances.
When reviewing Flynn's claims concerning the suppression of his statements, we note that a trial court's findings on *Page 300 
conflicting evidence will be upheld unless palpably contrary to the weight of the evidence.
 "`Where the evidence of voluntariness is conflicting, and even where there is credible testimony to the contrary, the trial judge's finding of voluntariness must be upheld unless palpably contrary to the weight of the evidence. Ash v. State, 424 So.2d 1381, 1385 (Ala.Cr.App. 1982).' Whisenant v, State, 466 So.2d [995,] 1001 [Ala.Cr.App. 1984]. The trial judge has a duty to resolve questions of fact regarding the voluntariness of a confession when presented with conflicting evidence on that issue. See Ex parte Johnson, [522 So.2d 234 (Ala. 1988)]; Sales v. State, 432 So.2d 560 (Ala.Cr.App. 1983). A finding of voluntariness need be supported only by a preponderance of the evidence. Jackson v. State, [516 So.2d 726 (Ala.Cr.App. 1985)]."
Carr v. State, 545 So.2d 820, 824 (Ala.Cr.App. 1989).
 I.
Flynn contends that the trial court erred in denying his motion to suppress statements given to police before his arrest. Flynn presents five arguments in support of this contention, alleging that he was not adequately advised of his rights under Rule 11, Ala.R.Juv.P., also referred to as "super Miranda," or "juvenile Miranda" rights.
First, he alleges that the fact that he was 17 years old at the time of the offense entitled him to be properly advised of, and accorded, the "juvenile Miranda rights" contained in Rule 11, Ala.R.Juv.P., before his being questioned by police, even though he was being investigated for a capital offense and, under § 12-15-34.1, Ala. Code 1975, he was not subject to the jurisdiction of juvenile court but was to be charged, arrested, and tried as an adult.
Flynn is correct. Recently in Anderson v. State, [Ms. CR-95-0768, May 8, 1998] 729 So.2d 900 (Ala.Cr.App. 1998), and Young v. State, [Ms. CR-95-2195, October 2, 1998] 730 So.2d 1251
(Ala.Cr.App. 1998), and State v. Banks, 734 So.2d 371 (Ala.Cr.App. 1999) this court ruled that the language of § 12-15-34.1 does not divest the child who has been charged with a capital offense of the protections afforded by Rule 11(B), Ala.R.Juv.P.[3]
Nevertheless, the record confirms that Flynn was advised of his juvenile Miranda rights upon being taken into custody and before questioned by police.
 I.A.
Flynn contends that his rights under Rule 11(A)(1), Ala.R.Juv.P., were violated because at 4:30 p.m. when he was handcuffed and arrested by Officer Thrash, he was not informed of the reasons for his being taken into custody.
"Effective May 1, 1994, Rule 11, Ala.R.Juv.P., was amended to clarify the child's rights at different phases of the case. Subsection (A) enumerates the child's rights when the child is taken into custody, while subsection (B) lists those matters a child in custody must be informed of before being questioned." Ingram v. State, [Ms. CR-94-1032, May 8, 1998] 729 So.2d 883, n. 1 (Ala.Cr.App. 1998). The comment to Rule 11 states:
 "This rule clarifies the child's rights at the different phases of the case. Subsection (A) enumerates the rights child must be given as soon as the child is taken into custody. Subsection (B) lists the `SuperMiranda' rights that must be read to the child before the child is questioned while in custody. Subsection (C) lists the things of which the person in charge of the intake office or the detention facility must inform the child upon the child's being detained. Subsection (D) lists the rights a child must *Page 301 
be given upon the child's detention in an intake office or a detention or shelter care facility."
There is no merit to this assertion. Rule 11(A)(1), Ala.R.Juv.P., states that "[w]hen the child is taken into custody, the person taking the child into custody must inform the child of . . . the reason for the child's being taken into custody." In the present case, when Officer Thrash and Officer Burgess picked Flynn up at 11:30 a.m., they told him they were investigating the death of a taxicab driver. Therefore, Flynn knew when he was taken into custody the reason he was being taken into custody.
 I.B.
Flynn contends that his rights under Rules 11(C)(1) and (3), Ala.R.Juv.P., were violated when, after he was brought to a place of detention, he was not informed of the reason he was being detained, nor was he informed that his parents would be informed of his whereabouts. Rules 11(C)(1) and (3) state:
 "When a child is brought to the intake office of probation services or delivered to a place of detention or shelter care, the intake office or person in charge of the facility shall immediately inform the child of the following:
"(1) The reason for the child's detention;
". . . .
 "(3) That the child's parents or guardian will be informed of the child's whereabouts and the reason for the child's detention."
This court has stated:
 "Under Rule 11, the person taking the child into must inform the child of the rights specified in part[s] (A) [and (B)]. However, part[s] (A) [and (B)] place no obligation on this person to inform the child's parents that the child has been taken into custody. It is the person in charge of the intake office, once the child has been brought to a place of detention, who must inform the child's parents of his detention. Rule 11(C) and (D)."
Carr v. State, 545 So.2d 820, 826 (Ala.Cr.App. 1989).
In the present case, both Flynn and his mother were told the reason Flynn was wanted for questioning and where he would be taken. However, the record is silent as to where Flynn was taken after he was questioned and arrested and what transpired there. Mrs. Flynn testified that someone telephoned her around 8:30 or 9:00 p.m., and told her that Flynn was being charged with murder. At that time she went to the police department and spoke with Flynn.
Based on the evidence before the court, Flynn's rights under Rules 11(C)(1) and (3), Ala.R.Juv.P., were not violated.
 I.C.
Flynn contends that his rights under Rules 11(D)(1), Ala.R.Juv.P., were violated when, after he was detained, his mother was not notified of his whereabouts and the reason for his detention, was not informed of his rights, and was not informed of her right to be represented by counsel. Rule 11(D)(1) states:
 "(D) Rights of the child upon detention in an intake office or detention or shelter care facility. When a child is detained pursuant to part (C) of this Rule, the person in charge of the intake office or the facility shall notify the child of the child's rights as set out in part (B) of this Rule.
 "(1) The person in charge of the intake office or the detention facility shall, in the most expeditious manner possible, ensure that the parents or guardian of the child are notified of the child's whereabouts and the reason for the child's detention. Except in the situation provided for hereinafter, the person in charge shall also inform the parents or guardian of the child of the child's rights and of the *Page 302 
parents' or guardian's right to be represented by counsel. The parents or guardian shall also be informed of the child's right to remain silent. However, if the child has been read his or her rights; understands those rights; knowingly, voluntarily, and intelligently waives those rights; and gives a statement, then it is not necessary that the parents or guardian be notified of the child's rights or be present during the interrogation. Such a notification to the parents or guardian shall, if practicable, be made in person or by telephone; otherwise, the communication shall be by the best means practicable."
In the present case, both Flynn and his mother were told why Flynn was wanted for questioning and where he would be taken. However, the record is silent as to where Flynn was taken after Flynn was questioned and arrested and what transpired there. However, Mrs. Flynn testified that someone telephoned her around 8:30 or 9:00 p.m., and told her that Flynn was being charged with murder. At that time she went to the police department and spoke with Flynn.
Based on the evidence in the record, Flynn's rights under Rules 11(D)(1), Ala.R.Juv.P., were not violated.
 I.D.
Flynn contends that the trial court erred in denying his motion to suppress on the grounds that the Montgomery County Sheriff's Office juvenile rights form does not conform to the law as set forth in Rule 11(B), Ala.R.Juv.P. Rule 11(B), Ala.R.Juv.P., states:
 "(B) Rights of the child before being questioned while in custody. Before the child is questioned about anything concerning the charge on which the child was arrested, the person asking the questions must inform the child of the following rights:
 "(1) That the child has the right to counsel;
 "(2) That if the child is unable to pay a lawyer and if the child's parents or guardian have not provided a lawyer, one can be provided;
 "(3) That the child is not required to say anything and that anything the child says may be used against the child;
 "(4) That if the child's counsel, parent, or guardian is not present, then the child has the right to communicate with them, and that, if necessary, reasonable means will be provided for the child to do so."
The juvenile rights form used by the Montgomery County Sheriff's office, which was read to Flynn, states:
 "Before I ask you any questions, I must explain to you that you can remain silent. Anything you say can be used against you in court. That you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the Court will appoint one before we question you. If you want to answer questions now, you can do so. But you can stop answering at any time. You have the right to communicate with your parent or guardian before any questions, if necessary. Reasonable means will be provided for you to do so."
(Vol. 8, R. 474.)
Flynn argues that the law requires that a juvenile be informed that "if he is unable to pay for a lawyer and if his parents or guardian have not procured a lawyer one can be provided at no charge." (Emphasis provided by Flynn.) In contrast, according to Flynn, the Montgomery County Sheriff's office juvenile rights form advises: "you have the right to advice and presence of a lawyer even though you cannot afford to hire one." (Emphasis provided by Flynn.) *Page 303 
Flynn argues that Dr. Guy Renfro, a psychologist, testified that the language "afford to hire one" used by the Montgomery County Sheriff's Office juvenile rights form requires more cognitive ability to understand than does the language in the rule, "unable to pay for a lawyer." Additionally, the Montgomery County Sheriff's form omits language from Rule 11(B)(2): "if the child's parents or guardian have not provided a lawyer." Also omitted is the language from 11(B)(4): "if the child's counsel, parent, or guardian is not present." Also, Flynn states that Rule 11(B)(3) requires that the child be informed that he "is not required to say anything." In contrast, the Montgomery County Sheriff's Office form states that "you can remain silent." According to Flynn, the phrase, "remain silent" is more complex and requires more cognitive ability to understand than the phrase, "not required to say anything." Flynn asserts that these omissions are particularly relevant because Mrs. Flynn had provided a lawyer for Flynn and the lawyer was present and available before Officer Means questioned Flynn.
An examination of each set of rights — the sheriff's form and the language in the rule — shows that the rights provided in Rule 11(B) were read to Flynn. The differences between the juvenile rights form used by the Montgomery Sheriff's Office and Rule 11(B) are de minimis.
Flynn also contends that the statement of his rights that he was read was erroneous because it did not say that reasonable means would be taken to provide the appellant with the opportunity to talk with his parents. This court in M.B.M. v. State, 563 So.2d 5 (Ala.Cr.App. 1989), held that a juvenile confession was not rendered involuntary by the fact that the rights read to the defendant did not include the phrase "reasonable means will be provided" to afford the defendant the opportunity to communicate with his parents.
We conclude that the Montgomery County Sheriff's Office juvenile rights form sufficiently conforms to the law as reflected in Rule 11(B), Ala.R.Juv.P.
 II.
Flynn contends that the trial court erred in denying his motion to suppress Flynn's statement to police on the grounds that he was deprived of his right to counsel. Flynn argues that the investigators with the Montgomery County Sheriff's Office withheld from him the fact that his mother had retained an attorney to represent him and that his attorney was attempting to contact him. This Flynn argues, was vital, material information that he needed to make an informed decision concerning the waiver of his rights. According to Flynn, the investigators interrogating him had a duty to advise him that an attorney had been retained to represent him and that that attorney was present, and the investigator's failure to do so, he says, deprived him of his constitutional right to counsel.
The record reflects that Flynn was advised of his juvenile Miranda rights and did not request the presence of his mother or an attorney before waiving his rights and giving a statement to police.
 "`[I]n Alabama, there is no requirement that the juvenile's parents be notified before or be present when the juvenile waives his constitutional rights. Likewise, there is no statute mandating the presence of a parent, guardian, legal custodian or attorney of a child during interrogation.' Ash v. State, 424 So.2d 1381, 1386 (Ala.Cr.App. 1982). Therefore, unless the appellant requested to speak with his mother, which — viewing the evidence in the light most favorable to the State — he did not do, he had no right to her aid."
O.M. v. State, 595 So.2d 514, 525 (Ala.Cr.App. 1991). Therefore, as we stated in O.M., "unless the appellant requested to speak with his mother, which — viewing the evidence in the light most favorable to the State — he did not do, he had no right to *Page 304 
her aid." Id. See, also, Gilchrist v. State, 585 So.2d 165, 169
(Ala.Cr.App. 1991)("Only the accused can invoke the Fifth Amendment right to counsel; it is a personal right which may not be asserted by the accused's lawyer.").
 III.
Flynn contends that the trial court erred in denying his motion to suppress his statements to police on the grounds that he did not knowingly and voluntarily waive his constitutional rights with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it.
Flynn maintains that his statements were involuntary because, he says:
 "1. [He] was 17 years old at the time of the interrogation; (Vol 5, page 15).
 "2. He was not informed of the charge and, therefore, had no knowledge as to either the substance of the charge or the nature of his rights to consult with an attorney and remain silent; (The fact that at the time of his questioning he was a prime suspect was never divulged to the accused and that would have been a material omission interfering with his ability to make an informed and knowledgeable waiver of his rights.) (Vol. 8, R. 484).
 "3. He was interrogated before a formal charge had been filed; (Vol. 5, R. 16).
"4. [He had an] IQ [of] 71; (Vol. 5, R. 24).
 "5. [There was no] evidence of prior experience with Miranda warnings; (Vol. 5, R. 28).
"6. Basis Reading Score in low 4%; (Vol. 5, R. 26).
 "7. Reading Comprehension in Lower 12%; (Vol. 5, R. 26).
 "8. Listening Comprehension in Lower 6%; (Vol. 5, R. 26).
"9. Vocabulary in Lower 5%; (Vol. 5, R. 27).
 "10. At Interrogation over five (5) hours; (Vol. 5, R. 53).
 "11. Nothing to eat during that time; (Vol. 7, R. 385).
 "12. Not informed of the charges against him; (Vol. 8, R. 484).
 "13. Not advised that his attorney was present and available to talk with him; (Vol. 4, R. 55); and
 "14. The use of the MCSO Miranda Warnings (States's Exhibit 1) was filled with lengthy, complex language; (Vol. 5, R. 20)."
(Appellant's brief at pp. 35-36) (Emphasis added by Flynn). In addition to the above factors, Flynn asserts that "the interrogators' suppression of the material fact that his attorney was present and desired to speak with him constituted deception, thereby depriving the Defendant of his rights to due process." (Appellant's brief at p. 36.) According to Flynn, the totality of the circumstances surrounding the interrogation reflect that he did not knowingly, intelligently, and voluntarily waive his rights.
The officers in contact with Flynn testified that he was advised of his juvenile Miranda rights on two occasions and that he appeared to understand his rights. He signed a waiver of his rights on both occasions. The officers noted that Flynn knew that the officers were investigating the murder of a taxicab driver; he should have been aware of his rights based on three or four prior instances of breaking the law; he displayed no intellectual deficiencies that prevented his knowingly and voluntarily waiving his rights; he was not under the influence of drugs or alcohol; he had no physical impairment that prevented his understandingly waiving his rights; he was not threatened or coerced into giving a statement; he was not promised anything in return for his statement; he was not handcuffed; he was not tricked in any way into giving a statement; he did not appear to be acting out a fantasy or to be pretending; and he appeared to be coping with the situation very well. The officers *Page 305 
also recounted that Flynn was offered food, water, and sodas, and that he was not restricted in any way after completing his first statement, and he was free to do whatever he wanted to do at that time. Also, according to the officers, Flynn never requested that his mother or an attorney be present at his questioning.
We note that no special emphasis was placed on Flynn's mental capabilities on appeal. However, out of an abundance of caution we note the following. Dr. Glenn Renfro, a licensed psychologist, evaluated Flynn to determine whether, in his opinion, Flynn was competent to waive his juvenile Miranda rights. Dr. Renfro determined that Flynn had an IQ of 71, a basis reading score in the low 4% of the population, a reading comprehension score in lower 12%, a listening comprehension score in lower 6%, and a vocabulary score in lower 5%.
Dr. Renfro concluded that he could not say that Flynn had a "full awareness of the consequences of his decision to abandon his rights." (Vol. 5, R. 32.) He described Flynn's case as "not a clear-cut case." (Vol. 5, R. 39.) He stated that the results of Flynn's mental evaluation placed him in a "grey area." (Vol. 5, R. 30.) Also, according to Dr. Renfro, Flynn's IQ was within the "borderline range." (Vol. 5, R. 31.)
 "An accused's alleged mental condition alone will not prevent a statement from correctly being received into evidence at trial. As this court has stated:
 "`The Alabama courts have recognized that subnormal tendencies of the accused are but one factor to review in the totality of the circumstances surrounding the confession. See McCord v. State, 507 So.2d 1030
(Ala.Cr.App. 1987); Sasser v. State, 497 So.2d 1131 (Ala.Cr.App. 1986); Corbin v. State, 412 So.2d 299 (Ala.Cr.App. 1982). For a more in-depth discussion of this point, see, 23 A.L.R. 4th 493; 8 A.L.R. 4th 16.'
 "`Judge Bowen, speaking for this court in Corbin, supra, 412 So.2d at 301, stated:
 "`"Mental `subnormality' does not in and of itself render a confession involuntary. Parker v. State, 351 So.2d 927 (Ala.Cr.App.), cert. quashed, 351 So.2d 938 (Ala. 1977); Arnold v. State, 348 So.2d 1092 (Ala.Cr.App.), cert. denied, 348 So.2d 1097 (Ala. 1977). The mere fact that the defendant was simpleminded or `functionally illiterate' will not vitiate the voluntariness of his confession."'"
Wheeler v. State, 659 So.2d 1032, 1034 (Ala.Cr.App. 1995) (citations omitted). "`"`While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible.'"'" Gaddy v. State, 698 So.2d 1100, 1116 (Ala.Cr.App. 1995), aff'd,698 So.2d 1150 (Ala. 1997) (citations omitted). In the present case, we cannot say that based on the totality of the evidence, that Flynn's borderline intellect prevented him from knowingly and voluntarily waiving his rights.
The record does not indicate that Flynn was subjected to any extraordinary circumstances in regard to his interrogation. Wedgeworth v. State, 610 So.2d 1244 (Ala.Cr.App. 1992). However, to any extent that the evidence is in conflict this court has previously held:
 "The standard of review when there is conflicting evidence at a hearing on a motion to suppress evidence of a confession is whether the trial court's decision was `manifestly contrary to the great weight of the evidence.' Ex parte Matthews, 601 So.2d 52, 54-55
(Ala.), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). We will not disturb the trial court's decision on the voluntariness of a confession unless it is *Page 306 
clearly erroneous. Ex parte Youngblood, 656 So.2d 390, 392 (Ala. 1995)."
Barnes v. State, 704 So.2d 487, 492 (Ala.Cr.App. 1997).
The record indicates that the appellant was read his juvenile Miranda rights and that his confession was made voluntarily and with the knowledge of the consequences. Therefore, the court's ruling that Flynn's statement was voluntary is supported by the evidence.
 IV.
Flynn contends that the trial court erred in admitting the hearsay testimony of a co-conspirator's statement. Flynn concedes that sufficient evidence was presented to establish that John Rogers ("Teeto") and Flynn ("Muffin") were co-conspirators. Shontae Rogers, John Rogers's sister, was called as a witness for the State. The State was granted permission to treat her as an adverse witness and a prior statement that she had given to detectives was used to refresh her memory. She was asked to testify concerning a conversation she heard between Rogers and her father at some point after March had been killed and his taxicab abandoned a the Carver Community Center, and her first interview with the police. The following occurred at trial.
 "Q. Okay. Did you ever hear your brother confess to killing the taxicab driver or being in on the killing of the taxicab driver?
"A. No.
 "Q. Did you tell the detectives that you had heard your brother? Question was, did you overhear a conversation —
 "MR. HALSTROM (Defense counsel): Where are you reading from?
"MS. REDMOND (Prosecutor): Page 8.
 "Q. Did you overhear a conversation that your Dad had with Teeto yesterday and Teeto told him something about the — who all was present whenever the cab driver got robbed? Do you remember that? What was your answer?
"A. Yes. He told my daddy —
 "MR. HALSTROM: Object, Your Honor, that's hearsay, overhearing a conversation.
 "MS. REDMOND: I didn't ask that question. My question was as to her statement. I didn't ask her to go into what was said. I asked her did she remember telling the detective that she overheard a conversation between her dad and Teeto in which Teeto told his dad something about who all was present when the cab driver got robbed.
 "Q. And you told them what? That you did hear that conversation, right?
"A. Yes.
 "Q. Okay. And you heard your brother confess to being present, didn't you?
 "MR. HALSTROM: Object, Your Honor. It's not a statement that he is offering to her. It's something that she overheard. That is double hearsay.
 "THE COURT: Jan [court reporter], bring your machine around here, please.
 "(The following occurred at the bench outside the hearing of the jury:)
 "THE COURT: Mr. Halstrom is correct. It is hearsay. I'm convinced at this point that there is sufficient evidence of record for me to apply the co-conspirator hearsay exception to these statements. I'm going to admit them.
"MS. REDMOND: Yes, sir.
"MR. HALSTROM: We object.
"THE COURT: I know.
"(The following occurred in the presence of the jury:)
 "Q. All right. Ms. Rogers, you overheard that conversation between your dad and your brother, right?
"A. Yes. *Page 307 
 "Q. And you heard your brother tell your dad that Reggie Morrell wasn't there?
"A. Yes.
 "MR. HALSTROM: Object, Your Honor, for the record.
 "THE COURT: I will give you a standing objection to it, Mr. Halstrom.
"Q. Did he tell your dad who was with him?
"A. Yes.
"Q. Who did he tell your dad was with him?
"A. Muffin.
"Q. Say it again.
"A. Muffin.
"Q. Okay. Is Muffin Antonio Fynn?
"A. Yeah."
(Vol. 8, R. 437-40.)
Flynn contends on appeal that the statement of the co-conspirator, Rogers, elicited from Shontae Rogers was not admissible because it occurred after the completion of the crime and after the conspiracy had ended.
 "`Where proof of a conspiracy exists, any act or statement by an accused's co-conspirator in the commission of the crime, done or made before the commission of the crime, during the existence of the conspiracy and in the furtherance of a plan or design, is admissible against the accused. A co-conspirator's act or statement after the commission of the crime ordinarily is not admissible against the accused.'"
Deutcsh v. State, 610 So.2d 1212, 1222 (Ala.Cr.App. 1992) (quoting C. Gamble, McElroy's Alabama Evidence §§ 195.03(1), (2) (4th ed. 1991) (emphasis added)).
The State contends that Flynn's only stated ground of objection at trial was that the testimony was hearsay. The State argues that Flynn is arguing for the first time on appeal that the testimony was inadmissible because the conspiracy had ended. "`The statement of specific grounds of objection waives all grounds not specified and the trial court will not be put in error on grounds not assigned at trial.' Ex parte Frith,526 So.2d 880, 882 (Ala. 1987)." Brown v. State, 701 So.2d 314, 318
(Ala.Cr.App. 1997). We reject the State's argument that the claim was not preserved for review on appeal. "`The record clearly shows that the trial judge was aware of the objection and the reason counsel was requesting it.'" Covington v. State,620 So.2d 122, 127 (Ala.Cr.App. 1993) (quoting Ex parte McCall,594 So.2d 628, 631 (Ala. 1991)). The trial court's comments — "I'm convinced at this point that there is sufficient evidence of record for me to apply the co-conspirator hearsay exception to these statements" — clearly shows that the court was applying the co-conspirator exception to Flynn's hearsay objection. The record further reflects that Flynn immediately objected to the admission of the testimony based on this exception to otherwise inadmissible hearsay.
We do not have to determine whether the trial court correctly ruled in allowing the objected-to testimony of Shontae Rogers. If the evidence in question is inadmissible hearsay as urged by the defense, its admission was, at most, harmless error. Rule 45, A.R.App.P. "[T]estimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred." White v. State, 650 So.2d 538, 541 (Ala.Cr.App. 1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239 (Ala.Cr.App. 1995). Here, the objectionable testimony of Shontae Rogers was merely cumulative of other evidence presented at trial. "The erroneous admission of evidence that is merely cumulative is harmless error." Dawson v. State, 675 So.2d 897, 900 (Ala.Cr.App. 1995).
In addition to Flynn's confession in a statement given to police, the State's evidence showed that Flynn was seen at Rogers's residence with a pistol the day before *Page 308 
the murder. During a conversation with Reggie Morrell on Friday, June 30, 1995, in Rogers's presence, Flynn told Morrell that he and Rogers were planning to rob a taxicab. Rogers did not dispute Flynn's assertion. Rogers told Flynn that they would have to kill the driver to prevent his identifying them and their being sent to jail for the robbery. Flynn agreed with the plan but refused to be "the trigger man." In the early evening, of Friday, June 30, 1995, Rogers telephoned for a taxicab to be sent to his home address. March's taxicab arrived, and Rogers and Flynn left in the taxicab with March. March was shot in the head and his body was left on Edda Lane. The taxicab was found at Carver Community Center. March's money pouch was found empty. Rogers and Flynn returned to Rogers's home on foot not very long after they had left with March. Rogers had blood on his shirt and Flynn's pants were wet. They appeared to have been running and were breathing hard. Flynn made the comment to those present in Rogers house that "if somebody tell, he'll kill them." (Vol. 8, R. 429.) The following day Rogers also told Reggie Morrell that "we did it", but Morrell stated he did not know what Rogers meant by this comment. (Vol. 8, R. 515) Rogers was also seen the day following the murder with an unusually large amount of cash.
The admission of Shontae Rogers's testimony constituted harmless error because it did not affect the outcome of Flynn's case in light of the lawful admission of other similar evidence, including Flynn's own confession. There was overwhelming evidence supporting Flynn's conviction. See, State v. Parker, [Ms. CR-95-1435, September 26, 1997] 725 So.2d 1092 (Ala.Cr.App. 1997), reversed on other grounds, [No. 197001, February 26, 1999]740 So.2d 432 (Ala. 1999).
 V.
Flynn contends that the trial court erred in denying his motion for a judgment of acquittal made at the conclusion of the State's case. He argues that the only evidence before the jury implicating him in the commission of the crime were his two statements taken by officers of the Montgomery County Sheriff's Department and the testimony of Shontae Rogers concerning a statement made by John Rogers Jr., to Rogers's father. According to Flynn, absent these statements, the state offered nothing to link Flynn to the crime.
The State disputed Flynn's allegation and quoted the findings of fact from the trial court's sentencing order summarizing Flynn's participation in the crime. These findings showed that sufficient evidence was before the court at the time the motion for a judgment of acquittal was made to deny the motion.
The facts presented in Part IV of this opinion, which are similar to the trial court's findings, provide sufficient evidence to withstand a motion for a judgment of acquittal.
The possible erroneous admission of a co-conspirator's statement has no bearing on our review of denial of the motion for a judgment of acquittal. "[I]n reviewing the sufficiency of the evidence, we are to consider all erroneously admitted evidence." Peoples v. State, 615 So.2d 1265, 1267 (Ala.Cr.App. 1992).
 "`In a challenge of the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate court will not substitute its judgment for that of the trier of fact.' Maddox v. State, 620 So.2d 132, 133 (Ala.Cr.App. 1993). Conflicting evidence presents a jury question not subject to review on appeal, provided that the state's evidence established a prima facie case. Gunn v. State, 387 So.2d 280
(Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala. 1980). A trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was *Page 309 
made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199
(Ala.Cr.App. 1983). Furthermore:'
 "`"`A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust.'"'
 "McCollum v. State, 678 So.2d 1210, 1215 (Ala.Cr.App. 1995), quoting Cox v. State, 500 So.2d 1296
(Ala.Cr.App. 1986), quoting in turn other cases."
Ingram v. State, [Ms. CR-94-1032, May 08, 1998] 729 So.2d 883, (Ala.Cr.App. 1998).
In the present case, the preponderance of the evidence was not against the verdict. The trial court correctly denied the motion for a judgment of acquittal.
Flynn's conviction is affirmed.
AFFIRMED.
Long, P.J., and McMillan, Baschab, and Fry, JJ., concur.
[1] Mrs. Flynn was also referred to in the record as Fostay Flynn.
[2] Because there are several places in the record beginning with page number 1, our citations to the record will include the volume number in addition to the cite to the clerk's record (C.R.) and the hearing and trial transcripts (R.).
[3] The Alabama Supreme Court denied certiorari review on March 19, 1999, in Young. The Court denied certiorari review in Anderson on February 19, 1999.